[Crim. No. 2009. Fifth Dist. Oct. 9, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHNNY LEO BENJAMIN, Defendant and Appellant.

**COUNSEL**

Sidney M. Levin, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Eddie T. Keller and Charles J. James, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**FRANSON, Acting P. J.—**

### STATEMENT OF FACTS

In the early morning hours of December 23, 1973, appellant and Bobby Lee Gibson were in an after-hours bar-restaurant called Henry VIII—The Dungeon in Bakersfield. Delbert Adams, the victim, was also in the bar. Appellant was wearing a wide-brimmed, leather or suede hat, a sleeveless shirt, and had a coat draped over one arm. Gibson wore a tight fitting navy watch-cap.

An argument developed between Adams and appellant. Some foul language was exchanged but no blows occurred. Appellant and Gibson left the bar after the argument subsided.

Adams remained in The Dungeon, was introduced to Marlene Reel, and danced until about 5:30 a.m. Mrs. Reel then declined an invitation to have breakfast with Adams, so Adams walked Mrs. Reel to her car in the parking lot as she had decided to go home.

James Irwin worked as a parking lot guard at The Dungeon. Irwin's shift was from 10 p.m. to 6 a.m. At approximately 5 to 5:15 a.m. on December 23, Mr. Irwin observed a Volkswagen with a white top, dark body and missing front bumper make two or three passes through The Dungeon parking lot. The Volkswagen contained two occupants. The passenger wore a wide-brimmed hat and was bent over looking toward the exit door of The Dungeon.

Mrs. Reel testified that as she and Adams exited The Dungeon at approximately 5:30 a.m. someone called the name John or Johnny. The couple walked to Mrs. Reel's car and entered the vehicle. Mrs. Reel sat in the center of the front seat, and Adams sat behind the steering wheel with his left leg protruding out the open driver's door. A Volkswagen with a light top and dark bottom approached the rear of Mrs. Reel's car, paused and continued away. The driver of the Volkswagen had a very white face and was wearing a tight, knit cap. Shortly thereafter a man approached Mrs. Reel's car and inquired, "Are you the one who wanted a piece of us?" The man, identified as appellant by Mrs. Reel, then shot Adams once. Mrs. Reel leaped from the car and ran inside The Dungeon. While running Mrs. Reel heard three more shots.

From a distance of 50 yards, Irwin saw a man pull the door of Mrs. Reel's parked car open, step back and fire several shots into the car. The man wore a wide-brimmed hat and a windbreaker. After firing the shots the man turned and ran. Irwin was unable to identify him.

The police arrived at The Dungeon parking lot at 5:50 a.m. Adams' body was still in Mrs. Reel's car. An APB was issued for the two-toned Volkswagen with the missing front bumper.

Adams suffered four .22 caliber bullet wounds—two in the upper back area and two in the lower pelvic area. Adams died as a result of the multiple gunshot wounds.

The two-toned Volkswagen with the missing front bumper was located at 6:30 p.m. on December 23, 1973, at the Bakersfield residence of Mr.

Reil Hunt. Inside the car was a brown felt hat, a plaid car-coat and a nylon windbreaker.

Mr. Reil Hunt was Bobby Lee Gibson's grandfather and he owned a Volkswagen with a white top, blue body and a missing front bumper. Bobby Lee Gibson lived in the Hunt residence during December 1973 and used the Volkswagen.

Appellant and Bobby Lee Gibson visited the apartment of Mrs. Magdalena Nunnally on the afternoon of December 23, 1973, and spent most of the night there. While in Mrs. Nunnally's apartment appellant showed an interest in all news broadcasts on the radio. Appellant would increase the volume and listen to each news broadcast. Appellant stated, "The son-of-a-bitch died," and laughed when he learned of Adams' death. Appellant and Gibson left Mrs. Nunnally's apartment at about 4 a.m. on December 24 but returned at about 11 a.m. the same day. Appellant and Gibson were arrested in Mrs. Nunnally's apartment at about 4:10 p.m. on December 24.

The defense presented evidence that the plaid car-coat and windbreaker found in the Volkswagen belonged to Bobby Lee Gibson and that he also owned a brown felt hat with a brim on it. Bruce Baker and Archie Brown testified that appellant was intoxicated on the night of December 22 and early morning hours of December 23, 1973. John Ingram testified that shortly after the shooting Mrs. Reel told him that the assailant wore a stocking cap and not a brown hat. Appellant did not testify.

## LESSER OFFENSES

Appellant contends that the trial court erred in failing to *sua sponte* instruct the jury that assault with a deadly weapon in violation of Penal Code section 245 is a lesser included offense of murder. Appellant argues that the instruction was required because (1) there was prosecution evidence that appellant told a witness he didn't intend to kill the victim, and (2) in addition to alleging that appellant committed a murder the information alleged that he used a firearm in the commission of the offense in violation of Penal Code section 12022.5.

A necessarily included offense exists when the charged offense as defined by statute cannot be committed without also committing a lesser and included offense. (*People v. Cannady,* 8 Cal.3d 379, 390 [105

Cal.Rptr. 129, 503 P.2d 585]; *People* v. *St. Martin,* 1 Cal.3d 524, 536 [83 Cal.Rptr. 166, 463 P.2d 390].) It is of no consequence that the evidence at trial might also establish guilt of another and lesser crime than that charged. To constitute a lesser and necessarily included offense it must be of such a nature that as a matter of law and *considered in the abstract* the greater crime cannot be committed without necessarily committing the other offense. (*People* v. *Preston,* 9 Cal.3d 308, 319 [107 Cal.Rptr. 300, 508 P.2d 300]; *People* v. *Escarcega,* 43 Cal.App.3d 391, 396-397 [117 Cal.Rptr. 595].)

It is apparent that murder can be committed without committing an assault with a deadly weapon or by means of force likely to produce great bodily injury. For example, one could commit a murder by withholding food and drink from an invalid. Therefore, the statutory definition of murder does not necessarily include assault with a deadly weapon.

In addition to the statutory definition, the language of the accusatory pleading must be looked to in order to determine if a lesser included offense instruction is required. (*People* v. *Marshall,* 48 Cal.2d 394 [309 P.2d 456].) The rationale is to put the defendant on notice that he should be prepared to defend against evidence showing the elements of the lesser pleaded crime. (48 Cal.2d at p. 405; see also *People* v. *St. Martin, supra,* 1 Cal.3d at p. 536.) In the present case, appellant was charged with having murdered Delbert Adams, and with having used a firearm in the commission of that offense in violation of Penal Code section 12022.5. Appellant contends that the "use" allegation of the information in connection with the charge of murder encompassed a lesser included offense of assault with a deadly weapon. This contention specifically was rejected in *People* v. *Orr* (43 Cal.App.3d 666 [117 Cal.Rptr. 738]). In *Orr,* the defendant was charged with assault with a deadly weapon and with using a firearm in connection with the assault in violation of Penal Code section 12022.5. He argued that language of the "use" allegation rendered the pleading specific enough to include also a charge of the offense of drawing or exhibiting a firearm in a rude, angry or threatening manner or the use thereof in a fight or quarrel in violation of Penal Code section 417. The court stated: "An allegation of applicability of Penal Code section 12022.5 is not part of a charge of an offense itself. It merely provides for added penalty in crimes in which a firearm is used and is a legislatively mandated method of requiring and providing for such penalty. It was so held in *People* v. *Henry* (1970) 14 Cal.App.3d 89 [91 Cal.Rptr. 841]. We now further hold, as a logical

consequence of this rule, that an allegation of firearm use for purposes of Penal Code section 12022.5 is not to be considered in determining whether the accusation encompasses a lesser included offense." (43 Cal.App.3d 666, 673-674.)

The rule announced in *Orr* is sound; otherwise an instruction on assault with a deadly weapon would have to be given in every murder, robbery or rape case in which the "use" allegation under section 12022.5 is charged.

■ Even if it were held that the charging allegations of the pleading included a lesser offense of assault with a deadly weapon, the trial judge would not have been under a duty to so instruct. The trial court must instruct the jury on the general principles of law relevant to the issues raised by the evidence which includes instructing on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present (*People v. Sedeno,* 10 Cal.3d 703, 715 [112 Cal.Rptr. 1, 518 P.2d 913]; *People v. Hood,* 1 Cal.3d 444, 449 [82 Cal.Rptr. 618, 462 P.2d 370]); however, no instruction is required where there is no evidence from which the jury could conclude that the offense was less than that charged. (*People v. Noah,* 5 Cal.3d 469, 479 [96 Cal.Rptr. 441, 487 P.2d 1009].) Here, there was overwhelming evidence that someone murdered the victim. Appellant employed a dual defense of "some other dude did it," and/or "I was drunk." Neither of these defenses would have justified a verdict of assault with a deadly weapon; about the only conceivable circumstance that might have justified an assault verdict would have been if there were evidence that cast doubt upon the cause of death being the four bullet wounds. There was no such evidence. Therefore, even if assault with a deadly weapon were a lesser included offense within the allegations of the pleadings, it was not error to fail to so instruct.

Moreover, in the context of the present case, it seems unlikely that appellant would have even wanted an instruction on assault with a deadly weapon as a lesser included offense. As it was, the jury was instructed on first and second degree murder and voluntary and involuntary manslaughter. Had the jury believed appellant's evidence that he was drunk they might have concluded that he lacked both malice and intent to kill and therefore he would have been guilty of involuntary manslaughter which has a maximum penalty of 15 years. Assault with a deadly weapon carries a life maximum imprisonment. Appellant might well have felt that an assault charge was a "greater" rather than a lesser included offense, and that it was one he could well do without.

## LIMITATION ON CROSS-EXAMINATION

■ Appellant next contends that the trial court committed prejudicial error by precluding inquiry on cross-examination of the home addresses of four prosecution witnesses.

At a pretrial hearing in chambers, the prosecutor stated that he objected to revealing the present addresses and places of employment of four prosecution witnesses. He said that Magdalena Nunnally, in whose apartment appellant was arrested, would testify that appellant threatened to kill her if she turned him in. David Cuen, who witnessed the argument in The Dungeon and talked to Marlene Reel immediately after the shooting, had received an anonymous telephone threat that he would be killed if he testified. Marlene Reel, who was with the victim when he was killed, and Zoa Hill, who witnessed the events inside The Dungeon, were "very frightened by the whole situation." Apparently this was because the prosecutor was in possession of tape-recordings made of appellant's phone calls from the jail which the prosecution interpreted to mean that appellant was threatening that unidentified witnesses would be shot if they didn't leave town. In addition, the prosecutor stated that another witness, John Ingram, would testify that someone had fired two shots into his house a few days after his name appeared in the paper. While Ingram's address was not in dispute (at the time of trial he was residing in a federal prison), the shooting apparently contributed to Mrs. Reel and Mrs. Hill's apprehension.

The trial court ruled that defense counsel was precluded only from eliciting on cross-examination the home addresses of these four witnesses. Counsel was permitted to inquire into their places of employment, type of employment, and whether Mrs. Hill and Mrs. Reel were living together. In fact, the defense did elicit testimony regarding the witnesses' employment. The trial court's stated reason for the ruling was that the danger to the witnesses overrode the materiality of the evidence.

In *Smith* v. *Illinois*, 390 U.S. 129 [19 L.Ed.2d 956, 88 S.Ct. 748], the petitioner's conviction of illegal sale of narcotics was reversed on the ground that his constitutional right to a fair trial was violated by the trial court's ruling that the correct name and address of the informer witness need not be disclosed. There was no suggestion of danger to the physical safety of the witness and the concurring opinion of Justice White, joined in by Justice Marshall, suggested that under proper circumstances, including a showing that the information would tend to endanger the

personal safety of the witness, he might be excused from answering. (390 U.S. at pp. 133-134 [19 L.Ed.2d at pp. 959-960].) This rationale was followed in *United States* v. *Palermo* (7th Cir.) 410 F.2d 468, 472, in which the court òbserved that the decision to disclose a witness' address or place of employment cannot be made in a vacuum, and where a showing is made of actual rather than conjectural threats to the witness' safety, the trial court may, in its sound discretion, foreclose the inquiry.

In *People* v. *Brandow,* 12 Cal.App.3d 749, 754-755 [90 Cal.Rptr. 891], a conviction of pandering was reversed because the trial court sustained the prosecution's objection to a question as to what the prosecuting witness' true name was. The witness was a prostitute and police agent. The ruling was based upon a showing that the witness' life had been threatened. The reviewing court concluded, however, that in spite of the threats the identity of the witness *was an essential element in the protection of defendant's right to a fair trial;* the jury's determination of defendant's guilt or innocence depended upon a finding of his credibility as against that of the prosecuting witness. The court stressed that the only evidence against the defendant was supplied by the witness.

In *People* v. *Mascarenas,* 21 Cal.App.3d 660 [98 Cal.Rptr. 728], a conviction of furnishing a narcotic to a minor was reversed because the subject of the address of the minor witness, a police agent, was ruled to be impermissible cross-examination. The address was highly relevant because the minor had kept the narcotics in a jacket pocket at his home for five days before turning it over to the police; the trial court's rulings "precluded the defense from exploring the possibility of facts bearing upon the security of the real evidence vital to the conviction" and it was also relevant "as it might permit the development of facts which would bear upon his community reputation or tend to show bias." (21 Cal.App.3d at pp. 666-667.)

In *People* v. *Patejdl,* 35 Cal.App.3d 936 [111 Cal.Rptr. 191], a conviction of offering to sell a narcotic and selling another substance in lieu thereof was affirmed by this court even though the main evidence against the defendant was supplied by a police agent whose address was suppressed. There was evidence before the trial court of specific threats against the agent. On appeal the court distinguished the cases discussed above because (1) there was no substantial conflict between the testimony of the defendant (whose defense was entrapment and lack of knowledge that the pills were non-narcotic) and the informer on the issues determinative of guilt, (2) the defendant had known the informer

on an intimate basis for over one and one-half years, (3) the defendant engaged in cross-examination of the informer on every phase of the case except his address, and (4) there was evidence of danger to the informer's wife. (35 Cal.App.3d at pp. 942-944.)

There is no question that in the present case the testimony of the witnesses, particularly Mrs. Reel and Mrs. Nunnally, was crucial. Mrs. Reel was an eyewitness to the killing and she identified appellant as the killer. Mrs. Nunnally provided the evidence about appellant listening to news broadcasts of the crime and laughing when he heard that the victim had died. Mr. Cuen and Mrs. Hill were witnesses to the events that took place inside The Dungeon prior to the killing.

However, the witnesses' home addresses were not essential to the defendant's right to a fair trial. This is not a case where a witness of questionable character such as a police narcotics informant provided the only evidence against the defendant. There were numerous witnesses who observed the events in the bar, there was the parking lot guard who witnessed the shooting from a distance and gave a description of the assailant which matched that provided by Mrs. Reel and who described the Volkswagen and its occupants which kept driving through the lot. There was the circumstantial evidence of the hat and coat found in the Volkswagen. There was also a pretrial statement by Mr. Reil Hunt, Bobby Lee Gibson's grandfather, that he had overheard appellant telling Gibson that he shot the victim four times. Finally, the defense was free to, and did, conduct a full cross-examination of the witnesses limited only by this one ruling.

There is no suggestion that the addresses would have aided the defense in showing the witnesses' reputation for untruthfulness or bias. Thus, it is clear beyond all reasonable doubt that the court's ruling did not contribute to the jury's verdict. (*Chapman* v. *California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].) In light of the substantial showing of possible danger to the witnesses the trial court properly exercised its discretion to preclude the defense from asking their home addresses.

## WAIVER OF PRESENCE AT CRIME SCENE

■ Appellant contends that he was deprived of the right to be personally present at the scene of the crime when the jury viewed it and when evidence was taken.

` During the trial the prosecution moved the court for the jury to view the parking lot of The Dungeon in order to observe the intensity of the lighting at night. The defense objected that various witnesses had already testified as to the lighting, that there would be a problem of establishing similarity of conditions, that it would be a burden on the jury, and that appellant's presence at the scene of the crime in handcuffs would be prejudicial to him. The prosecution's motion was granted; however, the court stated that it would order the sheriff to see that appellant was dressed in a shirt and tie without handcuffs and that he was to be transported in an unmarked car. The court further said that appellant should remain in the car at the scene so that the jurors would not attempt to substitute their own perceptive powers for those of the witnesses in evaluating the witnesses' descriptions of the killer. Defense counsel suggested that it might be better if appellant did not go to the scene. When the judge responded that he felt appellant should be there, defense counsel said he would waive appellant's personal appearance. The court then explained to appellant his right to be there, that the viewing of the lighting was a taking of evidence, and it explained the nature of the possibility of prejudice to appellant if the jurors were to see him at the scene. Appellant personally said he understood the danger, and he waived his right to be present.

At the scene of the crime, but before the jury arrived, the court and both counsel examined the parking lot guard, James Irwin, to establish that the lighting was substantially similar to that on the night of the crime. Thereafter, before being taken to the scene, the jury was instructed that the purpose of the visit was solely to view the lighting conditions.

A defendant's presence is required when evidence is taken before the trier of fact. (Pen. Code, § 977, subd. (b) and § 1043; *People v. House,* 12 Cal.App.3d 756, 766-767 [90 Cal.Rptr. 831] [overruled on other grounds in *People v. Beagle,* 6 Cal.3d 441, 451 (99 Cal.Rptr. 313, 492 P.2d 1)]; *People v. Teitelbaum,* 163 Cal.App.2d 184, 207-208 [329 P.2d 157].)

However, appellant's presence at the scene, including the preliminary questioning of Irwin out of the presence of the jury, was made unnecessary by his specific waiver of his right to be present. (*People v. Mathews,* 139 Cal. 527 [73 P. 416]; *People v. White,* 20 Cal.App. 156 [128 P. 417]; see also *People v. White,* 18 Cal.App.3d 44, 50 [95 Cal.Rptr. 576].) By personally and expressly waiving his right to be present, we hold that appellant impliedly waived his right to be present at any

preliminary determination at the scene, out of the presence of the jury, which was required before the jury could view the scene, i.e., that the lighting conditions were the same as those on the night of the crime.

Moreover, appellant has failed to show that he was prejudiced by his absence from the preliminary fact hearing. Applying the constitutional standard of *Chapman* v. *California, supra* (386 U.S. 18), we hold that beyond all reasonable doubt in light of the entire record, any error occurring in taking the evidence as to the lighting conditions out of the appellant's presence did not contribute to the verdict.

### MISTRIAL PROPERLY DENIED

The witness, Magdalena Nunnally, in whose apartment appellant was arrested, testified for the People. Before she testified, out of the presence of the jury, defense counsel expressed apprehension that she was going to relate hearsay statements made by Bobby Lee Gibson during the time Gibson and appellant were in her apartment. The prosecution made an offer of proof that she would only relate the threats appellant made against her and that she would describe appellant's actions in listening to radio broadcasts concerning the killing and his laughter and comment when he heard that the victim had died. The court then cautioned her not to relate statements made by anyone but appellant. Mrs. Nunnally then testified on direct as to appellant listening to the radio, but she denied hearing appellant make any comments about the news. She said it was Gibson who did that. The following exchange then took place:

"Q. Okay. Do you remember talking to Officer Godwin, Mrs. Nunnally?

"A. Yes, I do.

"Q. Was this sometime after the defendants were arrested?

"A. Yes.

"Q. Okay. Did you tell Officer Godwin that both Benjamin and Gibson told you that if anyone told on them they would kill you?

"A. I told them that, but Sissy was the one that told me that, they said that to her."

Upon cross-examination of Mrs. Nunnally, the following occurred:

"Q. Did you become intoxicated that evening at all?

"A. No. After I found out they had killed someone I quit drinking."

Out of the presence of the jury, defense counsel moved for a mistrial because of these comments by the witness. The motion was denied and the jury was admonished to disregard the comments.

Cross-examination of Mrs. Nunnally then continued and after a time another such exchange took place followed immediately by another admonition from the court:

"Q. Mrs. Nunnally, in this statement that you gave to the District Attorney, the District Attorney's investigator, did you tell him that at that time—at that time did you tell him that both you and Mrs. Moore were drunk?

"A. No, I didn't tell him that I was drunk. I was drinking. He had been drunk. But after I learned that they had killed someone I sobered up.

"THE COURT: That will be stricken. Disregarded. And, Mrs. Nunnally, you are not to be making statements of that nature. You are ordered not to do so now.

"A. Yes.

"THE COURT: You may read or learn hearsay, and it is not to be before this jury. I told you not to say things like that. That is stricken. And the jurors are not to regard it. That is to be stricken. Mrs. Nunnally, you are not to bring out anything hearsay. I carefully explained to you what hearsay was."

Appellant contends that striking the inadmissible testimony and admonishing the jury to disregard the comments was an inadequate remedy and that a mistrial should have been granted. It seems clear that some of the comments by Nunnally were inadmissible and it would be unrealistic to assume that the jury completely disregarded them. Subsequent testimony by police officers, however, effectively rendered moot any damage done by Mrs. Nunnally.

Bakersfield Police Officer Kennemer, who happened to be Mrs. Nunnally's nephew, testified that on December 24, Mrs. Nunnally told him that: "[T]hey were sitting in the living room having a few drinks, listening to the radio, and they were listening to a news broadcast, and the subject with Bobby Lee got up, turned the volume on the radio up and stated 'The son-of-a-bitch died,' then started laughing."

Police Sgt. Godwin testified that Mrs. Nunnally told him that when an officer knocked on her door, appellant and Gibson told her that if she opened the door they would kill her and the officer, and that several times during the period of time appellant was in her apartment, appellant told her "that if she would say anything about this that they would kill her."

In view of the admonitions to the jury and the subsequent testimony of the officers which substantially corroborated the inadmissible comments by Mrs. Nunnally, any residual effect of her testimony on the jury was harmless. (*People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].) It was not error to refuse to grant a mistrial. (See *People* v. *Woodberry,* 10 Cal.App.3d 695, 709 [89 Cal.Rptr. 330].)

### ALLEGED PROSECUTORIAL MISCONDUCT

Appellant contends a reversal is compelled because of two instances of misconduct by the prosecutor: (1) the prosecutor insinuated in the presence of the jury that defense counsel had influenced a witness' testimony, and (2) the prosecutor elicited inadmissible testimony.

During the course of the trial, the People called Reil Hunt, the grandfather of Bobby Lee Gibson. Prior to trial Hunt gave a taped statement to the district attorney's office in which he said he had heard appellant tell Gibson that he shot the victim four times. At trial Hunt retracted his statement and claimed he had heard no such thing. During the course of the prosecutor's redirect examination of Hunt the following transpired:

"Q. Did somebody ever talk to you besides Mr. Ulman [the defense attorney] in respect to the significance of the tape that you gave on April the 16th?

"A. No, sir.

"MR. ULMAN: Your Honor, I am going to object to that, assumes a fact not in evidence. I didn't talk to him before.

"MR. SPRAGUE [the prosecutor]: That is why I just asked the question, trying to find out.

"MR. ULMAN: You said anybody other than Mr. Ulman, I didn't talk to him.

"MR. SPRAGUE: What did you phone him for?

"MR. ULMAN: Mr. Sprague, your Honor—I request that the court find Mr. Sprague—that is complete misconduct on his part. I request—

"MR. SPRAGUE: I think we should have a complete investigation of the defense and find out why after he makes a phone call to the man this man refuses to testify in court.

"THE COURT: Well, the jurors—both attorneys will be cautioned that this is a trial they are trying, and not remark back and forth. And that the court sees both counsel in fine light." Immediately thereafter the jury was sent out and defense counsel moved for a mistrial. The motion was denied and the prosecutor was instructed to terminate the line of inquiry. The jury was admonished to disregard statements of counsel made "in the heat of battle."

Misconduct of the prosecutor may consist of improper remarks, and it implies a dishonest attempt to persuade the court or jury by use of deceptive or reprehensible methods. (*People* v. *Beivelman,* 70 Cal.2d 60, 75 [73 Cal.Rptr. 521, 447 P.2d 913].) It is misconduct to imply that defense counsel is acting unethically and in bad faith or has improperly secured perjured testimony. (*People* v. *Perry,* 7 Cal.3d 756, 789-790 [103 Cal.Rptr. 161, 499 P.2d 129].) Where misconduct does not assume federal constitutional dimensions, the prejudicial error test of *People* v. *Watson* (46 Cal.2d 818, 836 [299 P.2d 243]) applies. (*People* v. *Ruthford,* 14 Cal.3d 399, 409, fn. 3 [121 Cal.Rptr. 261, 534 P.2d 1341].)

The statements by the prosecutor which in effect accused defense counsel of causing Mr. Hunt to perjure himself at trial were misconduct. Under the *Watson* test, though, the error was harmless, because the jury was immediately admonished, the out-of-court tape-recorded statement

of Mr. Hunt was played to the jury and Hunt was generally unbelievable on the stand.

The second instance of alleged misconduct occurred when John Ingram, a witness to the events inside The Dungeon, was called as a defense witness. (He had previously testified for the People.) On direct examination by defense counsel, Ingram said that within a few minutes after the shooting, he asked Marlene Reel if the assailant had a brown hat and she said not; he asked if it was the man with a stocking hat on and she said yes.

On cross-examination the prosecutor asked Ingram if anything happened after the killing which might have influenced his testimony, and if soon after he made a statement to the police (which omitted this information) someone had fired a gun at his house. Ingram replied that someone had shot at his house and possibly at him. The court ordered the testimony stricken and defense counsel moved for a mistrial.

No connection was shown between appellant and the shots. On redirect, it was established that appellant was in jail at the time the shots were fired, and Ingram said it did not affect his testimony.

The evidence was inadmissible because it was not linked to appellant. While the eliciting of it probably did not rise to the level of misconduct, if it did, it was harmless because the jurors were aware that there was no evidence that connected appellant with the shots.

### ALLEGED INSTRUCTIONAL ERRORS
### CALJIC No. 8.25

■ One of the prosecution's principal theories in the case was that it was murder by means of lying in wait which is by statute declared to be murder in the first degree. (Pen. Code, § 189.) Over appellant's objection the jury was instructed on murder by means of lying in wait in terms of CALJIC No. 8.25:

"Murder which is immediately preceded by lying in wait is murder of the first degree.

"The term 'lying in wait' is defined as a waiting and watching for an opportune time to act, together with a concealment by ambush or some other secret design to take the other person by surprise. The lying in wait

need not continue for any particular period of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation.

"To constitute murder by means of lying in wait there must be, in addition to the aforesaid conduct by the defendant, an intentional infliction upon the person killed of bodily harm involving a high degree of probability that it will result in death and which shows a wanton disregard for human life."

Appellant contends that (1) murder by means of lying in wait is inapplicable to the facts of this case, and (2) CALJIC No. 8.25 is inaccurate because it erroneously implies that specific intent to kill is unnecessary in this crime.

There was evidence that appellant and Gibson left the bar after the argument with the victim, that they were later seen several times driving through the bar parking lot watching the bar door, that after the victim and Mrs. Reel left the bar and entered her car, appellant and Gibson drove by once more, and that appellant then appeared at the door of the parked car and spoke before the victim was aware of his presence. He immediately thereafter shot the victim.

Lying in wait is sufficiently shown by proof of concealment and watchful waiting. (*People* v. *Harrison*, 59 Cal.2d 622, 630 [30 Cal.Rptr. 841, 381 P.2d 665].) The element of concealment may manifest itself by either an ambush or by the creation of a situation where the victim is taken unawares even though he sees his murderer. (*People* v. *Ward*, 27 Cal.App.3d 218, 230-231 [103 Cal.Rptr. 671].) There was evidence here from which the jury could have concluded that appellant was waiting for the victim "with the intention of killing or inflicting injury upon [him], and that the killing was accomplished by the means of his watching and waiting in concealment." (*People* v. *Harrison, supra*, 59 Cal.2d at p. 631.) Therefore, it was not error to instruct on the theory of murder by means of lying in wait.

Appellant also contends that the instruction erroneously implies that intent to kill is not a necessary element of this type of first degree murder. Appellant argues that the fact of lying in wait merely dispenses with the necessity of finding premeditation and deliberation but that the other elements of murder, intent and malice, must be found. Specifically, appellant contends that the last paragraph of CALJIC No. 8.25 *supra*,

dispenses with intent to kill. The instruction states that lying in wait for a sufficient time shows a state of mind equivalent to premeditation and deliberation, and it goes on to say that there must also be an intentional infliction upon the person killed of bodily harm involving a high degree of probability that it will result in death and which shows a wanton disregard for human life. The latter statement is essentially a definition of implied malice. (See *People* v. *Sedeno*, 10 Cal.3d 703, 722-723 [112 Cal.Rptr. 1, 518 P.2d 913].)

Penal Code section 189 provides in pertinent part: "All murder which is perpetrated by means of a destructive device or explosive, poison, lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery, burglary, mayhem, or any act punishable under Section 288, is murder of the first degree; and all other kinds of murders are of the second degree."

In *People* v. *Thomas*, 41 Cal.2d 470 [261 P.2d 1], Justice Traynor, in a concurring opinion, explains:

"By the use of the phrase 'or any *other* kind of willful, deliberate, and premeditated killing' (italics added) following the phrase 'All murder which is perpetrated by means of poison, or lying in wait, torture,' the Legislature identified murder committed by any of the enumerated means as a 'kind of' willful, deliberate, and premeditated killing. Ordinarily, to prove that a killing was willful, deliberate, and premeditated, evidence must be introduced from which the trier of fact can determine the state of mind of the defendant before he committed the act that resulted in his victim's death, that is, whether the killing resulted from a deliberate intention to take human life.

"[However], if the killing is murder within the meaning of Penal Code, sections 187 and 188, and is by one of the means enumerated in section 189, the use of such means makes the killing as a matter of law the equivalent of 'a willful, deliberate, and premeditated killing.' Since any question as to the defendant's willfullness, deliberation, and premeditation is taken from the trier of fact by force of the statute [citations], it bears emphasis that a 'killing' by one of the three means enumerated in the statute is not the equivalent of a 'willful, deliberate, and premeditated killing' unless it is first established that it is murder." (*People* v. *Thomas*, 41 Cal.2d 470, 477-478 [261 P.2d 1].)

In *People* v. *Dickerson,* 23 Cal.App.3d 721, 727 [100 Cal.Rptr. 533], the defendant argued that a specific intent to kill must be independently shown for murder by lying in wait to be first degree murder. He urged that a distinction be drawn between murder by poison and torture, specified in Penal Code section 189, because the use of poison or torture in itself is extremely likely to produce death, while lying in wait is not, unless accompanied by an intent to kill. The court disagreed, stating: "Even if we were to agree with defendant in his subjective classification, the obvious answer must be that the Legislature clearly does not. Section 189 leaves no room for doubt. If the murder was perpetrated by means of lying in wait, it need not be independently determined to have been 'willful, deliberate and premeditated.' [Citations.] The crime of which defendant was convicted was not lying in wait, but murder. If it was perpetrated by means of lying in wait it is, by definition, first degree murder. Defendant has offered no reason why such a definition is contrary to law, and none is apparent." (23 Cal.App.3d at p. 727.)

CALJIC No. 8.25 is a correct statement of the law. It first states that *murder* which is immediately preceded by lying in wait is murder of the first degree. This means that the jury must find that the killing was with malice aforethought. (Pen. Code, § 187.) The instruction then defines implied malice which informs the jury that there must be an intentional infliction upon the person killed of bodily harm involving a high degree of probability that it will result in death, and which shows a wanton disregard for human life. Thus, there was no error in not instructing that murder by lying in wait must be accompanied by a specific intent to kill in order to be first degree murder. (*People* v. *Thomas, supra,* 41 Cal.2d 470; *People* v. *Ward,* 27 Cal.App.3d 218, 225-231 [103 Cal.Rptr. 671]; *People* v. *Dickerson, supra,* 23 Cal.App.3d 721, 727; Note, *Criminal Law: Homicide: Murder Committed by Lying in Wait* (1954) 42 Cal.L.Rev. 337.)

## CALJIC No. 3.31 and No. 4.21

 The prosecution also proceeded on a theory of a "standard" premeditated and deliberate first degree murder. Appellant requested and was refused instructions stating that in such a crime there must exist a union or joint operation of act or conduct and the specific intent to kill a human being. (CALJIC Nos. 3.31 and 4.21.) These instructions should have been given. The judge, however, ruled that the substance of these instructions was covered by other instructions.

The trial judge has a *sua sponte* duty to instruct on specific intent in specific intent crimes. (*People* v. *Ford,* 60 Cal.2d 772, 793 [36 Cal.Rptr. 620, 388 P.2d 892].) Premeditated and deliberate first degree murder requires a specific intent to kill. (*People* v. *Conley,* 64 Cal.2d 310, 320 [49 Cal.Rptr. 815, 411 P.2d 911].) While the judge did not give the two instructions requested, he did give CALJIC No. 8.20 which states that for the killing to have been deliberate and premeditated murder it must have been "preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill." Thus, the jury was instructed on the requisite intent.

Even if CALJIC No. 8.20 does not clearly explain the requirement of a specific intent to kill, the act of firing four shots from a .22 caliber weapon into the victim's back and buttocks at close range permits of no other interpretation than that appellant entertained an intent to kill. (See *People* v. *Ford, supra,* 60 Cal.2d 772, 793; *People* v. *Turner,* 22 Cal.App.3d 174, 184 [99 Cal.Rptr. 186].) As the jury was fully and correctly instructed on the defense of diminished capacity, and its relation to appellant's ability to formulate a specific intent to kill as well as to the elements of deliberation and premeditation (CALJIC Nos. 3.35 and 8.77), any error in failing to give CALJIC Nos. 3.31 and 4.21 was not prejudicial. (*People* v. *Ford, supra,* 60 Cal.2d 772, 793; *People* v. *Watson, supra,* 46 Cal.2d 818, 836.)

### Claimed Inadequacy of Counsel

Appellant has the burden of establishing counsel's ineffectiveness as a matter of demonstrable reality and not as a speculative matter. (*People* v. *Jenkins,* 13 Cal.3d 749, 753 [119 Cal.Rptr. 705, 532 P.2d 857].) The record must show that counsel was ignorant of the facts or the law and that such ignorance resulted in a withdrawal of a crucial defense, reducing the trial to a "farce and a sham." (*People* v. *Jenkins, supra,* 13 Cal.3d at p. 753; *People* v. *Ibarra,* 60 Cal.2d 460, 466 [34 Cal.Rptr. 863, 386 P.2d 487].) Cases involving a failure to make these careful, factual and legal investigations must be distinguished from cases wherein counsel, having made such inquiries and investigations, makes tactical decisions not to utilize the fruits of his labors. (*In re Saunders,* 2 Cal.3d 1033, 1042, fn. 7 [88 Cal.Rptr. 633, 472 P.2d 921].) Counsel's trial tactics will not ordinarily be second-guessed by appellate courts. (*People* v. *Najera,* 8 Cal.3d 504, 516 [105 Cal.Rptr. 345, 503 P.2d 1353].)

We reply to appellant's assertions of inadequate counsel as follows:

(1) Appellant contends that trial counsel was inadequate because there was evidence to justify a defense of self-defense. Appellant was smaller than the victim, appellant and the victim were involved in a verbally violent argument an hour or so prior to the shooting and one witness said that during the course of the argument the victim tapped appellant in the chest three or four times with his index finger. In the taped statement, Reil Hunt said that he heard appellant tell Gibson that when he walked up to the car and asked the victim if he "still wanted a piece of [him]" the victim said "yeah" and started to get out of the car and appellant then shot him. Given only these facts, and considering that the victim was shot four times in the back, it is not too difficult to see why trial counsel didn't assert self-defense.

(2) The record is clear that trial counsel suggested that appellant not accompany the jury to the scene of the crime for tactical reasons.

(3) There was a good tactical reason for not insisting on an assault with a deadly weapon instruction—it is a heavier crime than involuntary manslaughter. Furthermore, the issue was not legally available to appellant.

(4) Appellant contends that he was demeaned before the jury because the trial judge four times referred to trial counsel as a public defender. By failing to object, trial counsel "allowed the mantle of poverty to rest on appellant's shoulders." The argument is specious. Rich or poor, a defendant is presumed to be innocent until proven guilty. Public defenders are greatly respected in our judicial system.

(5) Appellate counsel contends that the clerk's transcript is devoid of a motion for a discovery order or any other motion other than for a continuance or a mistrial.

The existence of a discovery order was mentioned at trial and motions for mistrial, continuances and a new trial appear in the record. Appellate counsel does not suggest what further steps should have been taken.

■ (6) Appellant contends that trial counsel was inadequate because, although there was evidence that appellant was drinking prior to the shooting, the defense presented no expert witness to show resultant diminished capacity. Also, at trial, the prosecutor discovered that there

were some pills in the pocket of one of the jackets seized from the Volkswagen. The prosecutor speculated that they were "whites" and "mini-bennies." The judge decided to exclude these items. There was no proof that these pills were narcotic or that appellant had ingested any of them. Furthermore, appellant's trial tactic was to show that the jacket' belonged to Bobby Lee Gibson.

Defense counsel argued to the jury the issue of the effect of intoxication or mental state, and the jury was so instructed. Because there was little evidence as to the exact quantity of liquor consumed by appellant, and appellant was arrested too long after the crime to make a blood alcohol test useful, an expert's opinion as to the effect of alcohol upon appellant at the time of the killing would have been highly conjectural and cross-examination of the expert would have highlighted the weakness of the defense.

Furthermore, appellant's real defense was that Gibson was the triggerman. Too much stress on diminished capacity could have under-cut this defense. We find no inadequacy of counsel in failing to produce an expert witness on the issue of diminished capacity.

The judgment of conviction is affirmed.

Ginsburg, J.,* and Thompson, J.,† concurred.

---

*Assigned by the Chairman of the Judicial Council.

†Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.