85 Cal.App.3d 120 (1978)
149 Cal. Rptr. 180
In re JOHNNY V., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent,
v.
JOHNNY V., Defendant and Appellant.
In re JIMMY A., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent,
v.
JIMMY A., Defendant and Appellant.
Docket Nos. 31836, 31837.
Court of Appeals of California, Second District, Division Four.
September 27, 1978.
*123 COUNSEL
Paul Halvonik, State Public Defender, under appointment by the Court of Appeal, Gary Goodpaster, Acting State Public Defender, Charles M. Sevilla, Chief Assistant State Public Defender, Martin Stein and Allison B. Stein, Deputy State Public Defenders, and William J. Cox, under appointment by the Court of Appeal, for Defendants and Appellants.
Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Jay M. Bloom and Cecilia H. Johnson, Deputy Attorneys General, for Plaintiff and Respondent.
OPINION
JEFFERSON (Bernard), J. 

I

The Procedural History
On August 1, 1977, petitions were filed in the Juvenile Court of Los Angeles County alleging that on June 11, 1977, Jimmy A., a minor 15 years of age, and Johnny V., a minor 17 years of age, committed the felony offense of murder in violation of Penal Code section 187. The victim alleged to have been murdered was Charles Mulcahy. Both minors *124 denied the allegations of the petitions. On August 9, 1977, the juvenile court conducted hearings on the minors' motions to suppress evidence, made pursuant to Penal Code section 1538.5, and on Johnny V.'s additional motion to exclude his inculpatory statements. The motions were denied the following day. Thereafter, the parties stipulated that all evidence presented at the Penal Code section 1538.5 and Evidence Code section 402 hearings would be considered by the court as part of the evidence presented at the adjudication hearing, with the exception of that evidence which was received at the section 1538.5 hearing for the limited purpose of establishing probable cause and that evidence of Johnny V.'s statements would not be admissible against Jimmy A.
At the adjudication hearing at the close of the prosecution's case, both minors made motions for a judgment of acquittal pursuant to Penal Code section 1118. These motions were denied. Both minors then rested without presenting any evidence in their defense. The court sustained the petitions to the extent of finding that each minor had committed the offense of an assault by means of force likely to produce great bodily injury, in violation of Penal Code section 245, subdivision (a), a lesser and necessarily included offense within the murder charge. Each minor was declared to be a person described by section 602 of the Welfare and Institutions Code.
At a subsequent disposition hearing on August 25, 1977, each minor's motion for a general verdict of acquittal was denied. The court also made a finding that the offense committed in violation of section 245 of the Penal Code was a felony and each minor was committed to the California Youth Authority. Each minor has appealed from the orders of the juvenile court  the orders which sustained the petitions of August 1 and the disposition orders of August 25, which committed the minors to the California Youth Authority.

II

The Factual Background
On June 11, 1977, at approximately 1:40 a.m., officers of the Los Angeles Police Department observed a group of about six to eight young Latin males congregated in the vicinity of Q Street and Frigate in Wilmington. It appeared that a fight was in progress. There was one person down in the street and the surrounding group of males were kicking him and hitting him with their fists. As the officers approached, *125 the group dispersed, leaving the victim covered with blood on the pavement. The officers proceeded in their vehicle in pursuit of those who had run from the scene. The officers finally stopped a speeding vehicle which appeared to come out of Q Street and make a sudden right hand turn on Wilmington Boulevard without stopping at the stop sign.
The stopped vehicle contained three males and two females. Blood was observed on the hands of the driver, Arvizo, and a knife was recovered from the vehicle  a knife that had fresh blood stains on it. In addition, there were beer bottles in the automobile. Johnny V. was in the back seat but Jimmy A. was not one of the males in this vehicle. Johnny V. was placed under arrest.
On arriving at the police station, Johnny V. was placed in a "holding tank," i.e., a cell six-by-eight feet with a glass enclosure. At about 4 a.m., investigating officers Drouin and Pagenkopp removed Johnny V. from the holding tank and took him to an interrogation room. There, he was advised of his Miranda rights; he waived them, and indicated that he was willing to talk to the officers. He told them that he and his companions were on their way to a party when they were stopped by the police, and that he knew nothing about a murder. Following this interview, appellant was left in the interrogation room, where he remained, alone. At about 7 a.m., Police Officer Hernandez asked one of the officers at the station the identity of those in custody for the murder offense. Upon being told that there were "about three or four guys in there," Hernandez walked over to the interrogation room and saw Johnny V. inside. Hernandez was acquainted with Johnny V., having talked to him on the street several times in connection with gang activities. Hernandez testified at the pretrial hearing that, before discovering Johnny V. in the interrogation room, he was unaware that Johnny had made any statements to the police. Hernandez further testified that he did not enter the interrogation room to elicit statements from Johnny V.; that he entered the room merely to learn who had been arrested for the murder. When Hernandez entered the room, Johnny V.'s first words to him were: "I'll take the Fifth. I don't want to talk." Hernandez replied: "Well, they got you for this thing, too, huh? ... Well, I could understand if they had gotten Haystack [the street name of Johnny's older brother] and not you." Johnny V. then made the following statement: As he and some others were riding in a car, they saw a drunk walking down the street; they stopped the car, got out, and jumped him; Johnny V. "was kicking him and doing his thing." Johnny added that he didn't see Al (Arvizo) stab the person, nor did he see "Badger" hit him with a bottle. When asked why he continued to talk *126 to Johnny after the latter had asserted his Fifth Amendment privilege, Hernandez replied: "He began talking to me, and I listened to him." Hernandez further testified that he asked Johnny V. no questions, and that Johnny's statements were "spontaneous." Johnny V. testified at the pretrial hearing that he told Hernandez at the outset that he did not want to talk to him and, in fact, Johnny did not want to talk; he did so only because he was asked questions.
Following his conversation with Johnny V., Hernandez told a police sergeant what Johnny had said. The sergeant suggested that Hernandez readvise Johnny V. of his rights and see if he then would make a statement. Hernandez did so, but Johnny V. again stated that he did not wish to talk and that he was "taking the Fifth." Thereafter, Johnny V.'s earlier statements to Hernandez were reduced to writing. It was these statements which Johnny V. sought to suppress as a violation of his Miranda rights.
Between 3 a.m. and 4 a.m. of the morning of the incident in question, Officer Drouin talked with Ramona, one of the females in the vehicle stopped by the police, who informed him that she had seen "Badger" hit the victim with a bottle. An inspection of the police files revealed that "Badger" was the street name for Jimmy A. The police files also revealed that Jimmy A. lived at a Wilmington address. Officers Drouin and Pagenkopp then went to the Wilmington address, but were referred to an address on Highland in Carson. At approximately 8:45 a.m., the officers arrived at the Carson address. The officers identified themselves and the door was opened by a Paul Ramirez, the owner of the residence. The officers stated to Ramirez that they were looking for Jimmy A. and Ramirez indicated that he could be found in a bedroom. Ramirez gave the officers permission to go into the bedroom.
Upon arrival at the bedroom door, the officers found the door locked. The officers knocked and stated "open the door  police." Ramirez then called his son's name, Robert, and requested Robert to open the door, that it was all right. The bedroom door was then unlocked and opened by the young man who turned out to be Robert. Jimmy A. was lying on the bed. He was placed under arrest and asked to get dressed.
As Jimmy A. started to put on his shoes, he took off the left shoe and pushed it under the bed. The officers recovered the shoes which appeared to have blood stains on them. Robert at first said the shoes were his, but *127 when the officers stated that Robert would then have to come with them, Robert said that the shoes belonged to Jimmy A.
An autopsy was conducted on the body of Mulcahy, the victim in the instant case, and death was ascribed to a hemorrhage as a consequence of stab wounds to the chest. No other wounds or injuries were asserted to be any contributing causes to Mulcahy's death. The knife found in the automobile was established to belong to Arvizo, the driver of the vehicle stopped by the police.
The blood stains on the shoes taken from the bedroom in the Ramirez home were human blood stains of type A blood, which was the same blood type as that of the victim. Jimmy A.'s blood type was found to be type O.

III

The Minors' Contentions on Appeal
The minors make the following contentions on appeal: (1) that the suppression-of-evidence motion should have been granted because of the warrantless arrest of Jimmy A. in the Ramirez house; (2) that the suppression-of-evidence motion should have been granted because the arresting officers did not comply with the knock and notice requirements of Penal Code section 844; (3) that the statements made by Johnny V. were secured by the police in violation of his Miranda rights and should have been held inadmissible; (4) that the trial court lacked jurisdiction to find that the minors had committed an assault by means of force likely to produce great bodily injury as such an offense is not a lesser and necessarily included offense within the crime of murder; and (5) that the Youth Authority commitments were made without appropriate and necessary findings.

IV

Jimmy A.'s Arrest Was Illegal and the Suppression-of-evidence Motion Should Have Been Granted
It is Jimmy A.'s contention that his arrest was illegal under principles of People v. Ramey (1976) 16 Cal.3d 263 [127 Cal. Rptr. 629, 545 P.2d *128 1333], and, consequently, the shoes and clothing worn by him should have been suppressed as being the product of the illegal arrest.
The essence of the Ramey holding is that, even though based upon probable cause, a warrantless arrest within a home is unreasonable per se unless there are exigent circumstances present to justify dispensing with the warrant requirement. Such a warrantless arrest constitutes a violation of the suspect's constitutional rights under the Fifth Amendment to the United States Constitution and under article I, section 13 of the California Constitution.
It is conceded in the case at bench that the police had no warrant for the arrest of the minor Jimmy A. in this case. The People, however, assert that there was a consent to enter the Ramirez home and that Ramey creates a second exception to an invalid warrantless arrest in a home and that this second exception is that a consent to enter will justify the warrantless arrest. There is no doubt that the actual holding in Ramey is to the effect that exigent circumstances will justify a warrantless arrest in a home. The question that is not entirely clear, however, is whether there is a second exception of a consent to enter as justifying a warrantless arrest.
Although there do not appear to have been any subsequent decisions of the California Supreme Court interpreting the Ramey decision as to whether a consent to enter will justify a warrantless arrest in a home, the majority in People v. Superior Court (Kenner) (1977) 73 Cal. App.3d 65 [139 Cal. Rptr. 343], interpreted the Ramey decision as creating an exception to the invalidity of a warrantless arrest in a home where there is a consent to enter given by the owner.
Assuming that, under Ramey, a consent to enter will justify the warrantless arrest of Jimmy A. in the home of Ramirez, we turn to the question of whether the evidence establishes that such a consent was given by Ramirez, the homeowner. Clearly, the facts do not establish any exigent circumstances. The officers had time to obtain an arrest warrant had they desired to do so.
At the suppression-of-evidence hearing, Officer Drouin testified as follows with respect to the Ramirez home visit and the arrest of the minor, Jimmy A.:[1]
*129 "Q. Now, after you had pulled a gang card out, did you and Officer Pagenkopp take some action with regard to Mr. A?
"A. Yeah.
"We went to 22602 Highland Avenue, in Carson.
"Q. That's the home of Mr. A?
"A. That's correct, yes.
"Q. Do you recall who met you at the door?
"A. Mr. Paul Ramirez.
"Q. Did Mr. Ramirez identify himself?
"A. Yes.
"We identified ourselves, and we asked him who he was and if Jimmy A. was present.
"Q. What did Mr. Ramirez say?
"A. Mr. Ramirez said that he was the resident, he was the owner of the residence, and that Jimmy A. was in a bedroom inside his house.
"Q. Were you given permission to enter the home and speak to Mr. A?
"A. Yes.
"Mr. Ramirez indicated to us the bedroom in which Mr. A. was in and gave us the approval to enter the room to talk to Mr. A.
"Q. What happened when you entered that room?
"A. Mr. A. was with another young man  I don't know his name  and they appeared to be sleeping.
"And Jimmy A. woke up, and we told him that we wanted him to come down with us to the station.
"Q. Did you indicate the reason?
"A. Yes."
This testimony of Officer Drouin raises the question of whether there was a valid consent by Ramirez for the police officers to enter his home for the purpose of arresting Jimmy A.
(1a) It is established law that the police may not justify a warrantless arrest if the limits of the consent to enter a home have been exceeded. A *130 police officer's right to enter is limited to the scope of the consent. A consent to enter for the purpose of talking with a suspect is not a consent to enter for the purpose of making an arrest of the suspect. Thus, in People v. Superior Court (Arketa) (1970) 10 Cal. App.3d 122 [89 Cal. Rptr. 316], the court held that a consent to enter could not be construed as a consent to search. In similar fashion, a consent to enter for the purpose of talking with a suspect may not be deemed a consent to enter to make an arrest of a suspect. The Kenner case is of significance here. In the Kenner case the court stated: "In Kenner, the request was to `talk to' Kenner. In fact, as the record makes clear, the officers had no intention of talking to Kenner at all. When he appeared he was immediately arrested, without any prior interrogation. A person may willingly consent to admit police officers for the purpose of discussion, with the opportunity, thus suggested, of explaining away any suspicions, but not be willing to permit a warrantless and nonemergent entry that affords him no right of explanation or justification." (Kenner, supra, 73 Cal. App.3d 65, 69 [40 Cal. Rptr. 841, 395 P.2d 889].)
In People v. Cruz (1964) 61 Cal.2d 861 [40 Cal. Rptr. 841, 395 P.2d 889], it was held that a general consent to search particular premises did not include a consent to pry into particular items located on the premises but which belonged to third persons (suitcases and boxes). And in People v. Harwood (1977) 74 Cal. App.3d 460 [141 Cal. Rptr. 519], it was held that an occupant's general consent to search particular premises and a consent to search for specific items did not include a consent for police officers to intercept telephone calls to the premises involved.
In the case at bench it seems clear that Officer Drouin and his partner sought from Ramirez a consent to enter and "talk" with the minor, Jimmy A. The People admit that at one point in Officer Drouin's testimony he indicated that he sought only a consent to enter the Ramirez home to talk with the minor such as was the case in Kenner. But the People point out that Officer Drouin testified differently in other parts of his testimony, which would justify the trial court in finding that the officer sought from Ramirez a consent to enter in order to arrest the minor Jimmy. The testimony of Officer Drouin which the People allude to is as follows:
"Q. Now, when you came to the front door, did you announce your identity and your reason for being there?
"A. Yes, I did. Yes.
*131 "Q. And it was at that time that the man opened the door?
"A. He had opened the door, and I did show him my identification card.
"Q. And were you talking in a normal conversational voice?
"A. Yes, that's correct.
"Q. Do you recall what you stated to him?
"A. I believe I inquired about Jimmy A.'s presence at that location.
"Q. Did he indicate to you that he was present?
"A. Yes, he did.
"Q. Did he indicate to you that he was in the bedroom?
"A. That's correct."
In addition, the People refer to another portion of Officer Drouin's testimony, which is as follows: "Q. Officer, at the time that you went to the Highland address, was it your intention to arrest Jimmy ...? [¶] A. Yes, it was."
(2) We start with the principle that in the case of a warrantless arrest and search, the burden is upon the prosecution to establish justification such as a consent to search, under a recognized exception to the warrant requirement. This burden of proof must be sustained by the preponderance-of-the-evidence standard. (See People v. James (1977) 19 Cal.3d 99, 106, fn. 4 [137 Cal. Rptr. 447, 561 P.2d 1135]; cf. Blair v. Pitchess (1971) 5 Cal.3d 258, 274 [96 Cal. Rptr. 42, 486 P.2d 1242, 45 A.L.R.3d 1206].)
"Similarly, it is the government's burden to prove that a warrantless search was within the scope of the consent given." (Harwood, supra, 74 Cal. App.3d 460, 466.) (Italics added.) In Arketa, the court sets forth this principle by stating: "The authority to search pursuant to a consent must be limited to the scope of the consent." (Arketa, supra, 10 Cal. App.3d 122, 127.)
(1b) A consideration of the evidence presented at the hearing of Jimmy A.'s suppression-of-evidence motion can only lead to one conclusion, namely, that the prosecution failed to sustain its burden of establishing that Ramirez, the owner of the premises, gave to Officer *132 Drouin and his partner a consent to enter to arrest the minor. The evidence presented is only susceptible reasonably to the interpretation that the officer sought consent to talk with the minor and not to arrest him.
The testimony of Officer Drouin upon which the People rely does not sustain the People's position. That testimony does not change at all Officer Drouin's first statement that he sought entrance from Ramirez for the purpose only of talking with the minor. Officer Drouin's subsequent statement that he informed Ramirez of the purpose of his visit can only refer to the words of the conversation with Ramirez which Officer Drouin said he had with Ramirez upon going to the premises. Furthermore, nothing is added by Officer Drouin's subsequent testimony that at the time he went to the Ramirez premises it was his intention to arrest Jimmy. His internal and unannounced intention cannot be converted by any reasonable inference into an announced purpose of arrest  conveyed to Ramirez  to sustain the trial court in its implied finding that the prosecution had sustained its burden of proof, by a preponderance of the evidence, that Ramirez had given the officers a consent to enter for the purpose of making an arrest of the minor.
Since we hold that Jimmy A.'s suppression-of-evidence motion should have been granted, we find it unnecessary to consider Jimmy A.'s contention that there was a failure of the police to observe the knock and notice requirements of Penal Code section 844.

V

Evidence of Johnny V.'s Statements to the Police Was Secured in Violation of His Miranda Rights and Should Have Been Held to Be Inadmissible
(3) The rule of law is well settled that, once a suspect indicates that he wishes to assert his privilege against self-incrimination, it is unlawful for the police to continue or renew interrogation of the suspect and any statement thereafter elicited from him is inadmissible. (People v. Pettingill (1978) 21 Cal.3d 231, 240-241 [145 Cal. Rptr. 861, 578 P.2d 108].) It was explained in Miranda v. Arizona (1966) 384 U.S. 436, 473-474 [16 L.Ed.2d 694, 723, 86 S.Ct. 1602, 10 A.L.R.3d 974]: "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point, he has *133 shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked." (Italics added; fn. omitted.)
The juvenile court found that after Johnny V. had asserted his Fifth Amendment privilege, he voluntarily told Officer Hernandez of his involvement in the crime. The court further found that, following Johnny V.'s "voluntary" statement, Hernandez questioned him regarding the participation of others in the crime, and that Johnny V. "implicated himself" by his answers to those questions. Under Miranda, Johnny V.'s statements made in response to questions (i.e, his statements that he did not see Al stab the victim, and did not see "Badger" hit him with a bottle) clearly were inadmissible. The remaining question is whether Johnny V.'s prior statement describing his part in the crime, characterized by the court as a "voluntary" statement, was in fact voluntary within the meaning of Miranda and California cases which have considered the question.
In People v. Fioritto (1968) 68 Cal.2d 714, 719 [68 Cal. Rptr. 817, 441 P.2d 625], our Supreme Court stated: "[W]e prohibit only continued questioning after an individual has once asserted his constitutional rights. We do not, of course, disapprove of the use of statements, whether admissions or confessions, voluntarily initiated by a suspect. Such statements have been repeatedly sanctioned in the decisions of this court [citation], and are also expressly authorized in the Miranda opinion. `There is no requirement,' said the court, `that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment....' (Miranda v. Arizona, supra, 384 U.S. 436, 478 [16 L.Ed.2d 694, 726, 86 S.Ct. 1602, 1630, 10 A.L.R.3d 974].)" The Fioritto court then discussed several California cases holding that statements made by a defendant after he has asserted his constitutional rights are admissible where the defendant himself initiates the discussion with the police in which the statements are made. In conclusion, the court said: "We reiterate, however, that the foregoing authorities are inapposite under circumstances in which the police initiated resumption of interrogation. The form of the renewed queries, however subtle or gentle, cannot be considered in determining whether there has been a violation *134 of the stern principles prescribed by the Supreme Court in Miranda." (Id., at p. 720; see also People v. Ireland (1969) 70 Cal.2d 522, 536-537 [75 Cal. Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323].)
In the present case, Johnny V. did not seek out Officer Hernandez for the purpose of volunteering a statement. It was Hernandez who approached Johnny V. and then, despite Johnny V.'s immediate assertion of his Fifth Amendment privilege, initiated a conversation in the course of which Johnny V. described his complicity in the crime. Hernandez' first words to Johnny V., expressing his disbelief that Johnny V. had been arrested, were an invitation to him to explain his involvement in the crime. This clearly constituted a form of "subtle or gentle" query which was condemned in Fioritto. Accordingly, Johnny V.'s statement that he jumped the victim and kicked him was not volunteered within the meaning of Miranda and Fioritto and, therefore, was inadmissible.
This conclusion makes it unnecessary to discuss Johnny V.'s further contention that his statements were inadmissible because they were involuntary in that they were the product of coercion, both physical and psychological, practiced by the police on him during his detention at the police station. (See People v. Fioritto, supra, 68 Cal.2d at p. 717.)

VI

The Trial Court Lacked Jurisdiction to Find That the Minors Had Committed the Offense of an Assault by Means of Force Likely to Produce Great Bodily Injury Because Such an Offense Is Not a Lesser and Necessarily Included Offense Within the Crime of Murder Charged in the Petitions
The minors take the position on this appeal that the trial court lacked jurisdiction to make a finding that they had committed the offense of an assault upon the victim Charles Mulcahy by means of force likely to produce great bodily injury in violation of Penal Code section 245, subdivision (a), since the only offense charged in the petitions was that of murder. The minors' position is that the trial court was limited to making a finding that they had committed the offense charged  murder  or some other offense that was a lesser but necessarily included offense within the charge of murder.
*135 The minors assert that a violation of Penal Code section 245, subdivision (a), is not a lesser and necessarily included offense within the crime of murder.
The People concede that the offense of assault by means of force likely to produce great bodily injury, proscribed by Penal Code section 245, subdivision (a), is not a lesser and necessarily included offense within the crime of murder. (People v. Benjamin (1975) 52 Cal. App.3d 63 [124 Cal. Rptr. 799]; People v. Lewis (1960) 186 Cal. App.2d 585 [9 Cal. Rptr. 263].) (4) The primary test to be used in determining whether a particular lesser offense is necessarily included in a greater offense is set forth in People v. West (1970) 3 Cal.3d 595, 612 [91 Cal. Rptr. 385, 477 P.2d 409]: "`The test in this state of a necessarily included offense is simply that where an offense cannot be committed without necessarily committing another offense, the latter is a necessarily included offense.'"
In Benjamin, it was stated that for an offense "[t]o constitute a lesser and necessarily included offense it must be of such a nature that as a matter of law and considered in the abstract the greater crime cannot be committed without necessarily committing the other offense." (Benjamin, supra, 52 Cal. App.3d 63, 71.) (Italics in original.)
The Benjamin court went on to point out that "murder can be committed without committing an assault with a deadly weapon or by means of force likely to produce great bodily injury. For example, one could commit a murder by withholding food and drink from an invalid. Therefore, the statutory definition of murder does not necessarily include assault with a deadly weapon [or by means of force likely to produce great bodily injury]." (Benjamin, supra, 52 Cal. App.3d 63, 71.) (Italics added.)
But the People advance the argument that, even though the offense of assault by means of force likely to produce great bodily injury is not a lesser and necessarily included offense within the crime of murder, the trial court in the case at bench could still properly find that the minors committed the assault offense even though it is not a necessarily included offense within the charge of murder. But that this view is not the law is set forth clearly in In re Hess (1955) 45 Cal.2d 171, 174-175 [288 P.2d 5], in which the court held that "[a] person cannot be convicted of an offense (other than a necessarily included offense) not charged against him by indictment or information, whether or not there was evidence at his trial *136 to show that he had committed that offense." (See also People v. Lewis, supra, 186 Cal. App.2d 585, 599-600.)
(5) The basic reason for not permitting a defendant to be convicted of an offense not charged in the information as a lesser but necessarily included offense is that "[d]ue process of law requires that an accused be advised of the charges against him in order that he may have a reasonable opportunity to prepare and present his defense and not be taken by surprise by evidence offered at his trial." (In re Hess, supra, 45 Cal.2d 171, 175.)
The due process requirement that provides the basis for the inability of a court to convict a defendant of an uncharged offense not included as a lesser offense within the charged offense renders the court without jurisdiction to convict defendant of a different offense. "When a defendant pleads not guilty, the court lacks jurisdiction to convict him of an offense that is neither charged nor necessarily included in the alleged crime. [Citations.]" (People v. West, supra, 3 Cal.3d 595, 612.)
As the People point out, however, there are situations in which a defendant is not allowed to complain that he has been convicted of an offense not charged nor included within the charged offense as a lesser and necessarily included offense. Thus, it has been held that "[a] defendant who knowingly and voluntarily pleads guilty or nolo contendere can hardly claim that he is unaware that he might be convicted of the offense to which he pleads; his plea demonstrates that he not only knows of the violation but is also prepared to admit each of its elements." (West, supra, 3 Cal.3d 595, 612; see In re Hawley (1967) 67 Cal.2d 824, 828 [63 Cal. Rptr. 831, 433 P.2d 919].)
It has also been held that if a defendant either requests or acquiesces in a conviction of a nonlesser-included offense, he cannot claim lack of notice and the court has jurisdiction to convict him of such offense. (People v. Francis (1969) 71 Cal.2d 66 [75 Cal. Rptr. 199, 450 P.2d 591]; People v. Taylor (1969) 273 Cal. App.2d 477 [78 Cal. Rptr. 51]; People v. Blunt (1966) 241 Cal. App.2d 200 [50 Cal. Rptr. 440].)
The People urge that the two minors before us are precluded from claiming error in the trial court's finding that they committed the offense of a violation of Penal Code section 245, subdivision (a), on the theory that they acquiesced in the trial court's action. The People rely on People v. Powell (1965) 236 Cal. App.2d 884 [46 Cal. Rptr. 415], in which a *137 defendant submitted his case on the transcript of the preliminary hearing and offered no defense. The court found the defendant guilty of a lesser offense than that charged but not necessarily included within the offense charged. In holding that defendant could not object, the court reasoned: "In submitting the case as they did, neither defendant nor his counsel could rationally have anticipated anything other than a finding of guilty of some offense." (Powell, supra, 236 Cal. App.2d 884, 887.) (Italics added.)
In Powell, it was the failure of defendant to object to the court's procedure and the finding of guilt which was significant. The Powell court relied upon People v. Hensel (1965) 233 Cal. App.2d 834 [43 Cal. Rptr. 865], by stating: "As in Hensel, defendant's failure to object must be regarded as an implied consent to treat the information as having been amended to include the offense on which the sentence was imposed, and thus to be a waiver of the only objection  lack of notice of the offense charged  which was available to defendant." (Powell, supra, 236 Cal. App.2d 884, 888.)
The instant case, however, is not like that of Powell or Hensel. The minors before us did not acquiesce in the trial court's action. They did not fail to object as did the defendants in Powell and Hensel. On the contrary, adequate objections were made to the juvenile court's action in the case at bench. Both minors made a motion for judgment of acquittal at the close of the prosecution's case. (Pursuant to Pen. Code, § 1118.) Although the minors did not put on a defense, they made a motion for an acquittal after the court indicated that the evidence was insufficient to sustain a finding that the minors aided and abetted Arvizo in the latter's act of stabbing the victim and thereby perpetrating the offense of homicide. Both minors vigorously asserted that the assault offense was not a lesser and necessarily included offense within the crime of murder. At the beginning of the disposition hearing the minors again raised the issue that the assault offense  a violation of Penal Code section 245  was not a lesser offense included within the crime of murder, by making a motion for an acquittal, and asserting that they had not been put on notice that they were being subjected to the possibility of a finding that they had committed an offense in violation of Penal Code section 245, subdivision (a).
Had these minors been properly charged with the offense of an assault by means of force likely to produce great bodily injury, a felony, in violation of Penal Code section 245, subdivision (a), they might well have produced defenses. Certainly, there was no need to put on any defense in *138 the face of the prosecution's evidence that did not inculpate them in Arvizo's acts of stabbing the victim with a knife  the stab wounds being the sole cause of death. Under the circumstances, Johnny V. and Jimmy A. were denied their constitutional due process of law rights to be notified of the charges against them so that they could prepare a defense to the charge.
The errors discussed herein are obviously prejudicial and require reversal of the orders from which the appeals have been taken. We find no need, therefore, to discuss the contention that the orders of commitment to the California Youth Authority were fatally defective.

VII

Because of Penal Code Section 654, the Minors May Not Be Tried on an Amended or New Petition Charging Any Offense Growing Out of the June 11, 1977, Incident Involving the Victim, Charles Mulcahy
At the hearing before us both the People and the minors presented oral argument on the question of whether, in the event of a reversal of the juvenile court's adjudicatory and dispositional orders, the minors could be charged in an amended petition or a new petition with a violation of Penal Code section 245, subdivision (a), or with any other offense growing out of the June 11, 1977, incident involving the victim, Charles Mulcahy.
It is the contention of the minors that, in the event of a reversal, they are not subject to being tried for any offense growing out of the incident with the victim Charles Mulcahy, by reason of Penal Code section 654. The pertinent portion of section 654 provides that "an acquittal or conviction and sentence under either one [provisions of the Penal Code] bars a prosecution for the same act or omission under any other." Penal Code section 654 sets forth a public policy against successive prosecutions for the same course of conduct. "When, as here, the prosecution is or should be aware of more than one offense in which the same act or course of conduct plays a significant part, all such offenses must be prosecuted in a single proceeding unless joinder is prohibited or severance permitted for good cause. Failure to unite all such offenses will result in a bar to subsequent prosecution of any offense omitted if the initial proceedings culminate in either acquittal or conviction and sentence." (Kellett v. *139 Superior Court (1966) 63 Cal.2d 822, 827 [48 Cal. Rptr. 366, 409 P.2d 206]; fn. omitted.) (Italics added.)
The prohibition against multiple prosecutions, established by Penal Code section 654, assumes that a joinder is permitted of the several offenses for which a defendant may be prosecuted. "Penal Code section 954 provides for the joinder in a single accusatory pleading of two or more offenses connected in their commission or having a common element of substantial importance in their commission." (Kellett, supra, 63 Cal.2d 822, 825.) In the case at bench, pursuant to Penal Code section 954, the two minors could have been charged by separate paragraphs of a petition in the juvenile court with the offense of murder of the victim Charles Mulcahy and with the offense of assault by means of force likely to produce great bodily harm and even the misdemeanor offense of battery. Section 954 does not distinguish between felonies and misdemeanors in those provisions for joinder. Hence, a charge of a felony and a charge of a misdemeanor may be joined in the charging document. (See Kellett, supra, 63 Cal.2d 822, 826, fn. 3.)
The policy which supports Penal Code sections 954 and 654 is that of requiring a joinder of related offenses in a single prosecution in order to prevent harassment of a defendant and to save both the People and the defendant time and money required in the presentation of a needless repetition of evidence.
It must be recognized, however, that a joinder in a single prosecution of separate offenses growing out of the same transaction is not always required in order to preclude application of Penal Code section 654. The case of In re Dennis B. (1976) 18 Cal.3d 687 [135 Cal. Rptr. 82, 557 P.2d 514], presents a type of situation in which the failure to join two offenses in a single prosecution did not require the application of the proscription against successive prosecutions set forth in Penal Code section 654. In the Dennis B. case, a minor, while attempting to change lanes on a highway, had a collision with a motorcycle, which caused fatal injuries to the cyclist. The minor was first tried in municipal court on a traffic charge of making an unsafe lane change in violation of Vehicle Code section 21658, subdivision (a), and was fined $10. Three weeks later, a petition was filed in the juvenile court charging the minor with the offense of vehicular manslaughter in violation of Penal Code section 192, subdivision (3)(b). The minor in Dennis B. contended that Penal Code section 654 was applicable to preclude his prosecution in juvenile court after a prosecution in the municipal court for a traffic violation. The Dennis B. court first *140 stated that "[p]reliminarily, we recognize that one act, the unsafe lane change, did result in two offenses here, and this circumstance was susceptible of discovery in time to avoid multiplicity problems: since the cyclist died before either trial began, the prosecution could have filed manslaughter charges and either joined the two offenses or dismissed the lesser." (Id., at p. 693.)
But the Dennis B. court held that the proscription against successive prosecutions set forth in Penal Code section 654 was not applicable because the circumstances were not such that the prosecution was either aware of or should have been aware of the fact that more than one offense had been committed. The Dennis B. court set forth the issue as follows: "The issue is, under the Kellett standard, whether on the record herein the prosecution was or should have been `aware of more than one offense.'" (Dennis B., supra, 18 Cal.3d 687, 692-693.) The Dennis B. court observed that the Kellett principle of awareness of more than one offense to bring into play Penal Code section 654 "applies, however, only to intentional harassment, i.e., to cases in which a particular prosecutor has timely knowledge of two offenses but allows the multiple prosecution to proceed." (Id., at p. 693.)
In holding that the prosecution of the minor in Dennis B. for the offense of vehicular manslaughter could proceed in spite of the fact that there had been a prior prosecution of the traffic violation of unsafely changing lanes, without the latter prosecution constituting a violation of Penal Code section 654, the Dennis B. court distinguished the case of In re Benny G. (1972) 24 Cal. App.3d 371 [101 Cal. Rptr. 28], in which a probation officer first filed a robbery charge against a juvenile. But when the allegations were found untrue, the same officer filed a new petition alleging that the juvenile had been an accessory to the robbery. The Dennis B. court approved of the Benny G. holding that the accessory-to-robbery allegation was barred under Penal Code section 654 by reason of the juvenile's exoneration of the robbery charge. The Benny G. case was distinguished from Dennis B. in that, in Dennis B., there was no showing that a particular prosecutor actually knew of both offenses in time to prevent a multiplicity of prosecutions.
In the case at bench we must apply the Kellett-Dennis B. formula to ascertain whether the prosecution either knew or should have known of the two offenses of murder and assault by means of force likely to produce great bodily injury in connection with the death of the victim, Charles Mulcahy.
*141 We do not here deal with successive charging petitions as was the case in Dennis B. Certainly the situation at bench is more akin to that of the Benny G. case. The record indicates that, at the hearing on the motions made under Penal Code section 1538.5 and conducted under Evidence Code section 402, held on August 9 and 10, 1977, the People and the minors stipulated that an autopsy was performed on the victim's body on June 12, 1977, the day following the homicide, with the result that the cause of death was ascribed solely to the stab wounds to the chest and that there were no other wounds or injuries as contributing causes to the victim's death. It is of significance that the petitions charging the two minors with having committed murder on June 11, 1977, were not filed by the district attorney's office until August 1, 1977. As of the date of the filing of the petitions the district attorney's office was aware that the victim had died on June 11, 1977, the date of the murder offense, and that the June 12, 1977 autopsy revealed that the cause of death was solely from stab wounds.
The extensive evidence received at the hearing on the motions to exclude evidence on August 9 and 10, 1977, certainly informed the deputy district attorney prosecutor as of that time, if he had not seen the police reports prior to the hearing dates, that Arvizo was the person who had the knife and who committed the stabbing, and that Johnny V. and Jimmy A. could only be held responsible for murder as aiders and abettors. At no time, however, during the presentation of the evidence at the hearing on the suppression-of-evidence motions made by the two minors, nor during the adjudicatory hearings the following day on August 11, 1977, did the deputy district attorney prosecutor seek to amend the petitions to charge the two minors with a different offense such as an assault by means of force likely to produce great bodily harm or the misdemeanor offense of battery. The prosecutor was aware of the fact that the evidence presented at the suppression-of-evidence hearing reasonably established that the part played by the two minors, Johnny V. and Jimmy A., in the June 11, 1977 incident, was that of striking the victim with their fists and kicking the victim and the striking of the victim by Jimmy A. with a beer bottle or beer can.
It appears that the prosecutor made a deliberate choice of continuing with the adjudicatory hearing on the theory that the minors could be held responsible for the victim's murder by Arvizo on the theory of aiding and abetting. It follows, therefore, that in the instant case, the prosecutor clearly should have known of the two possible offenses  murder and assault by means of force likely to produce great bodily injury. Although *142 there is a disparity in gravity between a murder offense and an assault offense, nevertheless, "[w]hen both offenses are serious crimes, the potential for harassment and waste is sufficiently strong that section 654 imposes on prosecutors an administrative duty to insure that the charges are joined. Although occasional failure to coordinate prosecutorial efforts may result in a defendant guilty of a felony escaping proper punishment, such a risk `is inherent in the preclusion of section 654 of multiple punishment.'" (Dennis B., supra, 18 Cal.3d 687, 694.)
(6) We conclude that Penal Code section 654 is applicable to the case at bench to preclude any subsequent prosecution of the two minors, Johnny V. and Jimmy A., for any offense growing out of the June 11, 1977, incident. The juvenile court judge's invalid finding that the two minors had committed the offense of assault by means of force likely to produce great bodily injury in violation of Penal Code section 245, subdivision (a), as a lesser and necessarily included offense within the crime of murder, also constituted a finding that the minors had not committed the offense of murder  in essence an acquittal of the murder charge. This acquittal of murder makes applicable the principle that "[f]ailure to unite all such offenses will result in a bar to subsequent prosecution of any offense omitted if the initial proceedings culminate in either acquittal or conviction and sentence." (Kellett, supra, 63 Cal.2d 822, 827; fn. omitted.)
The orders appealed from are reversed with directions to the juvenile court to dismiss the petitions in accordance with the views set forth in this opinion.
Kingsley, Acting P.J., and Alarcon, J., concurred.
Respondent's petition for a hearing by the Supreme Court was denied December 13, 1978.
NOTES
[1] The statement has been edited to delete the full name of the minor, A.