Lavell **FRIERSON**, Petitioner,

v.

Arthur **CALDERON, Warden of California State Prison at San Quentin, Respondent.**

No. CV 92–6251–KMW.

United States District Court, C.D. California.

May 29, 1997.

498

Gwen Freeman, Knapp, Petersen & Clarke, Glendale, CA, Edward A. Rucker, Santa Monica, CA, for Petitioner.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Senior Assistant Attorney General, John R. Gorey, Supervising Deputy Attorney General, Steven D. Matthews, Deputy Attorney General, Los Angeles, CA, for Respondent.

## DECISION RE: CROSS–MOTIONS FOR PARTIAL SUMMARY JUDGMENT

WARDLAW, District Judge.

The Court has reviewed and considered all the papers and other materials, including the supplemental briefings by both parties in support of and in opposition to the Motion for Summary Judgment filed by Petitioner Lavell Frierson on June 18, 1996, and the Cross–Motion for Summary Judgment filed by Respondent on October 7, 1996. Having heard and considered the arguments of counsel on December 11, 1996, the Court is prepared to rule and hereby DENIES Petitioner's Motion for Summary Judgment, and **GRANTS** Respondent's Cross–Motion for Summary Judgment on claims C(2), H(2), 1(2) and 1(3).

## I. BACKGROUND

By this federal habeas corpus petition, Petitioner Lavell Frierson challenges the death sentence rendered in his third state court trial, a sentence affirmed by the California Supreme Court. These cross-motions for summary judgment address four of the twenty-two (22) claims in the petition, claims C(2), H(2), I(2), and I(3).

Petitioner's claims arise from his conviction of the premeditated and deliberate murder of Edgardo Kramer, for which he was sentenced to death on August 1, 1978.[1] The

---

1. The jury also convicted Petitioner of two counts of robbery, two counts of kidnaping for the pur-

jury found Petitioner was death-eligible due to two special circumstances: that the murder was committed during (1) the commission of a kidnaping and (2) the commission of a robbery. The California Supreme Court reversed these convictions on August 31, 1979. *People v. Frierson,* 25 Cal.3d 142, 599 P.2d 587, 158 Cal.Rptr. 281 (1979). A second trial took place in 1980. Petitioner was again convicted and sentenced to death. On the automatic appeal of that trial, the California Supreme Court affirmed his convictions of first degree murder and the other substantive offenses and enhancements, but reversed the finding of the special circumstances and the penalty judgment. *People v. Frierson,* 39 Cal.3d 803, 705 P.2d 396, 218 Cal.Rptr. 73 (1985).

A third trial of the special circumstances and penalty phase was held in November 1986. On the eve of that trial, Petitioner asserted his constitutional right to represent himself, which was denied. Petitioner's responsibility for the murder of one Douglas Green ("Green") arising from a juvenile adjudication was admitted as an aggravating circumstance. The jury found the special circumstances true and imposed the death penalty, which was affirmed by the California Supreme Court. *People v. Frierson,* 53 Cal.3d 730, 808 P.2d 1197, 280 Cal.Rptr. 440 (1991). Petitioner now challenges various aspects of the third trial.

## II. DISCUSSION

### A. The Denial of Petitioner's Request to Represent Himself—Claim C(2)

▮ Petitioner contends that he made a timely motion to represent himself at the third trial (the "*Faretta* motion"), which was denied by the trial court in violation of the Sixth Amendment. *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). The Court finds that Petitioner's *Faretta* motion was properly denied because

pose of robbery, and one count of assault with a deadly weapon by means of force likely to produce great bodily injury.

2. California requires for invocation of the "constitutionally mandated unconditional right of self-representation ... an unequivocal assertion of that right within a reasonable time prior to the commencement of trial." *People v. Windham,* 19 Cal.3d 121, 127–28, 137 Cal.Rptr. 8, 560 P.2d

it was made solely as a tactic for delay, and "was not made within a 'reasonable time prior to the commencement of trial.'" *Frierson,* 53 Cal.3d at 742, 280 Cal.Rptr. 440, 808 P.2d 1197 (quoting *People v. Burton,* 48 Cal.3d 843, 852, 771 P.2d 1270, 258 Cal.Rptr. 184 (1989)).

### 1. The Antiterrorism and Effective Death Penalty Act of 1996 (the "Act")

Preliminarily, California's assertion that the Act, specifically 28 U.S.C. § 2254(d)(1), precludes this Court's review of Petitioner's habeas petition was laid to rest by the Ninth Circuit in *Jeffries v. Wood,* 114 F.3d 1484, 1487 (9th Cir.1997) (finding against retroactive application to cases filed before the Act's effective date of April 24,1996). As it may be resurrected, however, *see Lindh v. Murphy,* 96 F.3d 856 (7th Cir.1996), *cert granted in part,* —— U.S. ——, 117 S.Ct. 726, 136 L.Ed.2d 643 (1997), the Court has considered California's position but finds that the analysis in this case would be unchanged "regardless of the resolution of the retroactivity issue ... in § 2254(d)." *Moore v. Calderon,* 108 F.3d 261, 263–64 (9th Cir.), *petition for cert. filed,* 65 U.S.L.W. 3728 (U.S. Apr. 18, 1997) (No. 96–1678). Here, whether the Court applies the Ninth Circuit's timeliness "gloss," (i.e. "a request is timely if made before the jury is empaneled, unless it is shown to be a tactic to secure delay"), or the less restrictive California rule,[2] Petitioner's motion must be denied because the request for self-representation was designed for delay and was not made within a reasonable time before trial began.

### 2. Petitioner Was Not Unconstitutionally Deprived of the Right of Self-Representation.

A defendant possesses a constitutional right to represent himself. *Faretta,* 422 U.S.

1187 (1977), *cert. denied sub nom.,* 434 U.S. 848, 98 S.Ct. 157, 54 L.Ed.2d 116 (1977). In contrast, the Ninth Circuit examines whether the motion was raised "before the jury was empaneled, unless it was shown to be a tactic to secure delay." *Fritz v. Spalding,* 682 F.2d 782, 784 (9th Cir.1982) (citing *Maxwell v. Sumner,* 673 F.2d 1031, 1036 (9th Cir.), *cert. denied,* 459 U.S. 976, 103 S.Ct. 313, 74 L.Ed.2d 291 (1982)).

at 817–18, 95 S.Ct. at 2532–33, "it is well established in this circuit that in order to invoke the sixth amendment right to self representation, the request must be: (1) knowing and intelligent; (2) unequivocal; (3) timely; and (4) not for purposes of delay." *United States v. Schaff,* 948 F.2d 501, 503 (9th Cir.1991) (citations omitted). Here it is undisputed that Petitioner's request was knowing and intelligent and unequivocal. Moreover, Petitioner's motion was not made within a reasonable time before trial commenced. Rather, as the trial court correctly found (Reporter's Transcript ("RT") at A44, A52–53, A62), despite having eleven months and numerous opportunities in which to assert his right of self-representation,[3] Petitioner did not do so until the very day the trial was to commence. As the trial court ruled, the "motion [was] late." (RT at A54.) And, as Petitioner acknowledges, if there is an affirmative showing that the motion to proceed *in pro persona* is a tactic to secure delay, the motion is untimely. Petition at 126–27.

■ Therefore, the only issue before this Court is whether the trial court's finding that the motion when made could only be a tactic to secure delay[4] is fairly supported by the record. *Maxwell,* 673 F.2d at 1035. When considering this question, the Court notes that the findings of fact made by the trial court are "based on 'the fact-finding tribunal's experience with the mainsprings of human conduct' *see Commissioner v. Duberstein,* 363 U.S. 278, 289, 80 S.Ct. 1190, 1198, 4 L.Ed.2d 1218 (1960), and on its experience in conducting trials and observing defendants' behavior." *Maxwell,* 673 F.2d at 1036. Here the trial court observed Petitioner throughout the resolution of three separate motions brought on the day of trial, examined the reasons provided as support for the motions, and specifically found that the self-representation request was made "solely for the purpose of delay." (RT at A53.) Such a determination should only be set aside if found to be clearly erroneous. *Maxwell,* 673 F.2d at 1036. In addition, in determining whether a *Faretta* motion is made solely for delay, the trial court may consider the events preceding the motion. *United States v. George,* 56 F.3d 1078, 1084 (9th Cir.) (citing *United States v. Flewitt,* 874 F.2d 669, 675 (9th Cir.1989)), *cert. denied,* —— U.S. ——, 116 S.Ct. 351, 133 L.Ed.2d 247 (1995); *see also Fritz,* 682 F.2d at 784–85. In making its decision in this case, the trial court had before it the timing of the *Faretta* motion, the simultaneous motion for a continuance, the request to have counsel relieved, and the manner in which the case had proceeded up until the day of trial.

Petitioner raised three issues on the day of trial, which the court considered simultaneously:[5] (1) a request to have present coun-

---

3. Petitioner claims that he was unaware until the original date set for trial that his attorney intended to proceed. This assertion is undercut by Petitioner's presence at the hearing on June 5, 1986, when the court set the matter for trial on September 29, 1986, with the understanding that the trial would begin within thirty days from that date. (RT at A9.)

4. Petitioner's argument that the trial court's finding that the motion was a delay tactic was merely a tentative opinion is without merit. This argument ignores the fact that the trial court had already listened in detail to each and every reason provided by Petitioner to justify a continuance, as the hearing on Petitioner's requests to relieve current counsel and for a continuance had been conducted that very morning. (RT at A41.) What Petitioner submitted to the court, after the court voiced its finding that the motion was made for the purpose of delay, was simply a summary of what had already been explained at length. The only conceivably new information was Petitioner's reminder that he had previously made a motion to be named as co-counsel, which was denied two months after his attorney, Mr. Arnold Lieman ("defense counsel"), was appointed to his case. (RT at A54.)

5. Petitioner complains that the trial court primarily considered whether granting the motion would provide Petitioner with the witnesses he sought, an issue appropriate to a motion to continue, but not to a motion for self-representation. It is plain, however, that although the trial court heard the issues together, it did separate the issues for resolution. During the *Marsden* hearing the trial court indicated that Petitioner might be erroneously assuming that permission to proceed in pro per meant a continuance of the trial:

I don't know whether your wish to represent yourself is based upon an assumption that there would be an automatic continuance. That is not necessarily the case. I'd have to find that there is good cause for a delay. So I'd like you to keep that in mind as we go

sel relieved; (2) a request for a continuance; and (3) the request for self-representation. The trial court considered each of the grounds raised for relief of counsel[6] in a separate hearing held pursuant to *People v. Marsden*, 2 Cal.3d 118, 465 P.2d 44, 84 Cal. Rptr. 156 (1970) (the *"Marsden* hearing"), and concluded that there was no good cause shown for relief of counsel. (RAT at 22, 27.)

These same grounds were advanced as the basis for the request for continuance. The court found that there was no independent basis for a continuance, reasoning in part:

> There has been no showing as to why additional time would actually secure these witnesses, or why your pro per status would secure them. There has been noth-

ing to indicate that that [sic] warrants a continuance.

(RT at A55.)

The court also correctly noted:

> This is not a new matter. Nothing has come up that would indicate a surprise or change of circumstances warranting further time.[7]

(RT at A52; *see also* RAT at 21 ("nothing has been mentioned ... [that would constitute] good cause for delay."))

Having held the *Marsden* hearing, and having dismissed any independent grounds for a continuance, the court took up the *Faretta* motion, asking Petitioner, preliminarily, how much of a delay Petitioner would

---

down the list here. And if that is still your request [to proceed in pro per] at the end of the consideration of the issues mentioned, then we'll take it up again at that point.

(Reporter's Augmented Transcript ("RAT") at 5.)

The trial court again clarified its consideration of the separate issues:

It seems to me that where that leaves us at this point, Mr. Frierson, is you have a two-fold request. Now, you are requesting to represent yourself in propria persona.... At the same time, it seems to me that you are expecting a delay, if that were to happen.

(RAT at 19–20.)

The trial court reiterated:

I haven't really considered your out and out request to represent yourself. And one of the reasons I haven't yet, but will in a few moments, is that if I grant that request and you don't get a continuance, you are faced with sitting here and proceeding in pro per, which may not be the best or most desirable thing to have happen. And there is nothing that has been mentioned this morning for which I can enter a finding of good cause for further delay. (RAT at 21.)

6. Petitioner voiced concerns regarding eight specific areas which he believed his attorney had not diligently pursued:

(1) obtaining psychiatric reports from the California Youth Authority ("CYA") file (RT at A35, RAT at 6, 8);
(2) obtaining school record (RT at A35, RAT at 4);
(3) contacting exculpatory and favorable character witnesses (RT at A54–55, RAT at 14–16);
(4) contacting and preparing an expert on the effects of drug use (RT at A29, RAT at 17–19);
(5) thoroughly investigating the informant, Mr. Walker (RAT at 23–27);
(6) seeking a continuance until a favorable witness, Zondre Wooley, was released from custody,

which allegedly was to occur one month after the trial was scheduled to begin (RT at A34–35); (7) obtaining parole records to demonstrate the manner in which Petitioner conducted himself while on parole (RT at A35, RAT at 6–7); and (8) securing attendance by the victim's widow (RAT at 4.)

The court concluded, after hearing from Petitioner, defense counsel, and the defense investigator, that none of these concerns reflected on defense counsel's diligence. For example, the CYA file had been destroyed on June 22, 1978, pursuant to standard procedures. (RAT at 7–8.) There was no showing the school records would have been helpful, and in any event, Petitioner had not even provided the name of the school to his counsel. (RAT at 12.) With respect to witnesses, Petitioner conceded that there had been some effort to locate them, (RAT at 15), but defense counsel was not sure that they would be located, even with a continuance. (RAT at 20.) As to the drug expert, defense counsel stated he could not find one "who would be credible and who would testify ... consistent with the defense." (RAT at 19.) It was apparent that defense counsel had investigated the informant, but had not developed useful information. (RAT at 26.) There was no need to delay for release of Petitioner's incarcerated witness, as she would in any event be impeached by her felony conviction, and the court would take steps to minimize the impact of her custodial status. (RAT at 13–14.) As for the parole records, Petitioner admitted that his parole officer told the investigator that they had been destroyed. (RAT at 6.) Finally, as to Petitioner's concern about accepting a stipulation instead of hearing live testimony from the victim's widow, the court noted that such a stipulation could not be admitted without Petitioner's consent.

7. The court also denied defense counsel's request for a short continuance to repair any damage to the attorney-client relationship. (RT at 44.)

be requesting if the motion was granted. Petitioner stated:

I would like to take this off calendar for trial setting and—and put it back at pre-trial stages and sixty-day continuance, so I can go through and read transcripts and see what the investigator had, what type reports he have, [sic] and just what needs to be done.

(RT at A50.)

The court then stated:

It seems to me that the defendant has had ample time to monitor this. And if there were any problems, to voice them on any one of those dates. Now, I can only conclude that the request at this time, coupled with the request for a continuance, is **solely for the purpose of delay.** There is nothing that has been mentioned up to this point to lead me to any other conclusion.

(RT at A53 (emphasis added)). This conclusion was overwhelmingly supported by the record given that the court had already eliminated the existence of any other basis for a continuance.

It is true that there are circumstances in which a defendant may have valid reasons for failing to assert his right to represent himself until the eve of trial. See *Fritz*, 682 F.2d at 784. That is precisely the reason for the inquiry to ascertain whether the purpose of the request is to secure delay. *Id.* Here the trial court conducted a diligent inquiry, and concluded that Petitioner's request was made to secure delay. (RT at A53.) The trial court's finding establishes that the self-representation request was untimely. *United*

*States v. Smith*, 780 F.2d 810, 812 (9th Cir. 1986).

Petitioner also contends that his request should be deemed timely because on the day that his trial was scheduled to begin, he learned his attorney did not intend to present his PCP intoxication defense. Upon appeal of his second trial, Petitioner had expressly won the right to present just such a defense. The fact that a key defense was not going to be presented was not communicated to the trial court, however; Petitioner merely stated that some witnesses had not been contacted, and a PCP expert had not been located.[8] In hindsight, had this information been presented it might have caused the trial court to reconsider its denial of the *Faretta* motion. Nevertheless, this Court finds that the trial court's determination that Petitioner's motion was made for the purpose of delay was fairly supported by the facts before it.

■ Petitioner's remaining arguments do nothing to diminish the validity and impact of the trial court's finding that his request for self-representation was made solely to secure delay, and therefore may be dismissed with relative dispatch. That a continuance until October 14, 1986 was ultimately granted (by a different court) does not change the propriety of the trial court's finding.[9] The focus of an inquiry to ascertain the timeliness of a *Faretta* request is not the **effect** of delay, but rather whether the **purpose** of the request was to delay the trial. *Fritz*, 682 F.2d at 784; *see also Armant v. Marquez*, 772 F.2d 552, 556 (9th Cir.1985). Nor does the fact that the parties did not actually expect the trial to start on the scheduled date, believing

---

8. Petitioner failed to inform the court that his desired defense was not going to be presented, despite the trial court's efforts to prompt him for an explanation as to why he waited so long to raise his *Faretta* motion. (RAT at 22, RT at A52–53.) Nor did Petitioner offer any reason why he would have just discovered that defense counsel's strategy differed from the one that Petitioner wanted to present.

9. Petitioner's argument that there was no rational basis for the trial court's finding of delay, since defense counsel had also requested a continuance to reestablish his relationship with Petitioner, is not well taken. The continuance was not sought by defense counsel until **after** Petitioner

made his *Faretta* motion, and was requested in the event that the motion was denied. (RT at A41–42, A56–57.) The trial court stated that it did not believe the requested continuance was necessary, and that a one day continuance should be sufficient. (RT at A44, A52, A62.) Since the trial court did not intend to grant defense counsel's request for a continuance, its finding that Petitioner was not entitled to a continuance was not illogical. While the record reveals that the trial court referred defense counsel's motion for a continuance to another department, which ultimately granted the motion, (RT at 65–66), this does not reflect inconsistent reasoning on the part of the trial court.

the matter would trail for two days, lessen the validity of the trial court's finding. It is uncontroverted that Petitioner made his *Faretta* request on the very day that trial was scheduled to begin.

■ Petitioner contends that in ruling on his *Faretta* motion, the trial court considered Petitioner's ability to perform the duties of counsel. That the court advised Petitioner that the decision to represent himself might not be in his own best interest is irrelevant where, as here, the trial court based its ruling on delay alone. *Smith*, 780 F.2d at 812 (no error when court noted that the defendant lacked legal experience, but "clearly based its decision on timeliness"). In any event, the transcript reveals that the court was clarifying that a continuance would not be automatically granted if Petitioner were permitted to represent himself, and noting that Petitioner should consider the possibility that he would have to proceed in pro per without a continuance. (RAT at 5, 19–21.)

Nor was an additional burden placed upon Petitioner to demonstrate that his *Faretta* request was not an attempt to delay the proceedings. The trial court resolved the issues raised by the *Faretta* request and the request for a continuance separately. *See* discussion *supra* at 6–8; (RAT at 5, 19–21.) The burden of demonstrating that a continuance was necessary was properly placed on Petitioner as the moving party. That burden was not met. When examining the *Faretta* request, the trial court examined why the request was made on the day trial was scheduled to begin, and properly looked at the preceding events, *George*, 56 F.3d at 1084, which included the trial court's observation that the *Faretta* request was contingent upon obtaining a continuance, an observation implicitly confirmed by Petitioner, (RAT at 15; RT at A55), as well as the lack of good cause to support the request for a continuance. Once the trial court ruled that no continuance would be forthcoming, regardless of whether Petitioner represented himself, or defense counsel continued to represent him,

Petitioner declined to proceed in pro per.[10] (RT at A53–56.)

Based upon the above, the Court concludes that Petitioner was not unconstitutionally deprived of the right of self-representation.

**B. The Trial Court's Resolution of the Evidentiary Issues Arising from the Green Homicide and the Prosecution's Alleged Concealment of White's Ineligibility to Invoke the Fifth Amendment—Claims H(2), 1(2) and 1(3)**

These claims arise from the juvenile adjudication of the 1972 killing of Douglas Green, which was admitted as evidence in aggravation. First, Petitioner alleges that his Sixth Amendment right to present evidence was violated by prosecutorial concealment of Louis White's ("White") ineligibility to invoke the Fifth Amendment privilege against self-incrimination, in violation of *Brady v. Maryland*, 373 U.S. 83, 86, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963) (Claim H(2)). Second, Petitioner contends that it was error to allow White to invoke the Fifth Amendment privilege (Claim I(2)). Finally, Petitioner contends that the trial court erred by refusing to allow the defense investigator's proffered testimony that White had admitted to killing Green, contending that the testimony was admissible under the "declaration against penal interest" exception to the hearsay rule.

**1. Background**

**a. The Green Homicide**

The prosecution evidence of the Green homicide is accurately and succinctly described by the California Supreme Court:

> On May 20, 1972, Douglas Green was killed in Los Angeles by a bullet wound in the chest. Detective Sergeant Thomas Miller arrested defendant, Michael Concepcion [sic] and Lewis [sic] White for the homicide. All 3 were 15 or 16 years old. Detective Miller placed the three in an interview room, and went to another room where he could overhear conversation

---

10. Petitioner's response to the trial court's ruling on the continuance confirmed the trial court's understanding that the *Faretta* request was not made unconditionally, but was dependent upon receipt of a continuance.

among them. He heard defendant say, " 'I thought he had a cake cutter in his pocket and I pulled it out and it was a gun.' " Defendant said that he had "clicked the gun a couple of times and the gun went off, shooting the deceased"; and something to the effect, " 'I wonder if it would be self-defense if I had shot this dude with his own gun.' " There was some laughter followed by defendant imitating "the noises that the deceased made after he was shot in trying to breathe." Defendant said something like, " 'Did you hear the dude when I shot him? Did you hear him?' "

*Frierson*, 53 Cal.3d at 739, 808 P.2d 1197, 280 Cal.Rptr. 440. Detective Miller, who had spent eight hours interviewing Petitioner, White and Michael Conception ("Conception"), identified Petitioner's voice without hesitation. (RT at 2784, 2786.) In addition, White had pointed to Petitioner as the killer in the 1972 police report. (RT at 2927.)

### b. The Juvenile Adjudication of the Green Homicide

Petitioner, White and Conception were tried together at the juvenile trial. White was charged with three counts: (1) first degree murder of Green; (2) assault with a deadly weapon upon Davion Woodman; and (3) carrying a loaded firearm in a public place. On July 7, 1972 White pleaded guilty to the assault charge, and counts (1) and (3) were found not true and dismissed as to him. A petition of the Superior Court of California, County of Los Angeles, Juvenile Court, dated May 23, 1972, alleged that "on or about May 20, 1972, Lavell Frierson, a minor, did willfully, unlawfully and with malice aforethought murder Douglas Green, a human being, violating 187 of the California Penal Code." A certified copy of that petition was admitted into evidence, along with an adjudication report of the proceeding stating in part that the charge was "true and sustained." (RT at 2798.) As a result, Petitioner was committed to the California Youth Authority on July 31, 1972. (RI at 2798–99.)

### c. White's October 1986 Confession

Originally, in a 1972 police report, White identified Petitioner as the killer. (RI at 2927.) Fourteen years later, however, on October 8, 1986, White confessed to Green's killing. (RT at 2926.) This confession came during an interview conducted by defense counsel and Mr. Ingwersen, the defense investigator,[11] for the stated purpose of eliciting helpful information for Petitioner's case. (RT at 2928–29.)

### d. Testimony Regarding the Green Homicide

Testimony regarding the Green homicide was admitted as aggravating evidence in the following manner: (1) Detective Miller, who had spent eight hours interviewing Petitioner, White and Conception, testified that he had monitored a conversation between the three individuals in which Petitioner confessed to killing Green, (RT at 2784–87); (2) Detective Miller testified he observed Petitioner laughing and imitating the victim's attempts to breathe as he lay dying, (RT at 2786–87); (3) Phillip McCain ("McCain"), who allegedly witnessed the shooting, testified that a gang-related fight had broken out at the party where Green was killed, that Petitioner was not involved, and identified White as the killer, (RT at 2886–87); (4) McCain further testified that on that same evening, White called him and confessed to the shooting, (RT at 2887–88); (5) Conception, who was also present at the party, testified that he did not see Petitioner at the shooting, but that White was present and had a gun with him that night, (RT at 2899); (6) Conception further testified that he did not see who had actually shot Green, (RT at 2899); (7) White, whom McCain had identified as the killer, asserted his Fifth Amendment privilege in front of the jury, (RT at 2936); (8) White denied that he had confessed to the killing of Green, (RT at 2907–08); and finally (9) Petitioner, who had been adjudicated guilty and sent to the California Youth Authority for committing the Green murder, denied having any involvement in the shooting. (RT at 2942–44.)

---

11. Outside the presence of the jury, the defense investigator testified he told White during the meeting that "it would be helpful to Mr. Frierson's case if the truth were known in this matter." (RT at 2928–29.)

### e. White's Testimony

Before calling White, defense counsel asked the court to appoint independent counsel for him, expressing concern that he might make incriminating statements regarding the shooting of Green. The court took testimony concerning this request outside the presence of the jury. Defense counsel examined White, who admitted having a gun at the party at which Green was shot. (RT at 2907.) White testified that before he went to the party he had been involved in an altercation. (RT at 2906.) However, White denied either shooting or seeing who shot Green. (RT at 2907.) He further testified that Petitioner was not present when the shooting occurred. (RT at 2907.) White also denied telling defense counsel or the defense investigator that he had shot Green. (RT at 2907–08.)

After the jury reconvened, a bench conference was held in which defense counsel informed the court:

I had a brief discussion with White during this recess ... and reminded him of the fact that he hadn't told me some of the statements regarding his involvement. He said he didn't want to admit anything unless he had an attorney to advise him. Again, I am going to request the Court at least appoint counsel for him.

(RT at 2910.)

When asked to respond to defense counsel's request that the court appoint counsel, the prosecutor said nothing. (RT at 2910.) After excusing the jury again, the court questioned White about his concerns regarding testifying. The court then appointed a panel attorney to advise White. (RT at 2914–15.) After conferring with the panel attorney, White took the stand again, still outside the presence of the jury. White asserted the Fifth Amendment when defense counsel asked whether: (1) Green was a gang member; (2) White was involved in an altercation before attending the party where Green was shot; (3) White brought a gun to the party; (4) White arrived at the party with anyone else; and (5) White shot Green. (RT at 2917–18.) The defense asked that White be allowed to assert the Fifth Amendment privilege in front of the jury. (RT at 2915–19.) Sustaining the objections to that request, the court stated: "It would be the ruling of this Court, White having invoked the Fifth Amendment, that he may not be called." (RT at 2918.)

Defense counsel then asked the court to declare that White was unavailable as a witness. In support of this request, still outside the jury's presence, the defense investigator testified to White's October 8, 1986 confession. *See* discussion *supra* at 11; (RT at 2926.) The trial court found that White's statement was not a declaration against penal interest, ruling that the statement lacked "trustworthiness," as Petitioner had already been convicted of the murder, and "it [was] not apparent from the evidence that the declarant White had a sufficient belief that he could be punished for his role in that crime at this late date." (RT at 2933.)

White then testified for the first time before the jury. After four preliminary questions, defense counsel asked: "[w]ay back in 1972 were you at a party where Mr. Green was shot and killed?" White asserted the Fifth Amendment. (RT at 2936.) At the ensuing bench conference, the court reminded defense counsel of the court's prior ruling regarding White's assertion of the Fifth Amendment. Defense counsel expressed his inability to guess which questions would cause White to assert his Fifth Amendment privilege. (RT at 2937.) The trial court again refused to allow the defense investigator to testify. Thereafter, White was asked several questions about his previous felony conviction, and was excused. Immediately thereafter Petitioner took the stand and denied killing Green. (RT at 2942–44.)

### 2. The Prosecution Did Not Conceal Brady Material with Respect to White's Ineligibility to Invoke the Fifth Amendment Privilege—H(2).

■ Petitioner contends that his Sixth Amendment right was violated by prosecutorial concealment of White's ineligibility to claim a Fifth Amendment privilege. Petitioner asserts that both the prosecution's knowledge that White was ineligible to claim the Fifth Amendment because he had previ-

ously been acquitted of the crime, and the file, containing the minute order failing to sustain the petition against White, were withheld from the defense in violation of *Brady v. Maryland,* 373 U.S. 83, 86, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963). (Reporter's Transcript of December 11, 1996 Hearing on Cross–Motions for Summary Judgment ("Tr.12/11/96") at 19:24–20:9.)

To demonstrate a *Brady* violation, Petitioner must "show that the government withheld material, exculpatory evidence." *United States v. Zuno–Arce,* 44 F.3d 1420, 1425 (9th Cir.1995), *cert. denied,* — U.S. —, 116 S.Ct. 383, 133 L.Ed.2d 306 (1995). However, when "a defendant has enough information to be able to ascertain the supposed *Brady* material on his own, there is no suppression by the government." *United States v. Aichele,* 941 F.2d 761, 764 (9th Cir.1991) (citing *United States v. Dupuy,* 760 F.2d 1492, 1501 n. 5 (9th Cir.1985)); *see also United States v. Bracy,* 67 F.3d 1421, 1428–29 (9th Cir.1995)(finding government's "disclosure provided all the information necessary for the defendants to discover the alleged *Brady* material on their own, so the government was not guilty of suppressing any evidence favorable to [petitioner]").

"[S]uppression by the Government is a necessary element of a *Brady* claim, [so] if the means of obtaining the exculpatory evidence has been provided to the defense, the *Brady* claim fails." *Dupuy,* 760 F.2d at 1501 n. 5 (internal citations omitted); *accord United States v. Gonzales,* 90 F.3d 1363,1368 (8th Cir.1996) ("government need not disclose evidence available to the defense from other sources or evidence already possessed by the defendants"); *Westley v. Johnson,* 83 F.3d 714, 725–26 (5th Cir.1996) (no *Brady* violation if the defendant, "using reasonable diligence, could have obtained the information"), *cert. denied,* — U.S. —, 117 S.Ct. 773, 136 L.Ed.2d 718 (1997); *United States v. Payne,*

63 F.3d 1200,1208 (2d Cir.1995), *cert. denied,* — U.S. —, 116 S.Ct. 1056, 134 L.Ed.2d 201 (1996); *Felker v. Thomas,* 52 F.3d 907, 910 (11th Cir.1995), *aff'd on other grounds,* — U.S. —, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996); *Stockton v. Murray,* 41 F.3d 920, 927 (4th Cir.1994) ("*Brady* does not compel the disclosure of evidence available to the defendant from other sources, including diligent investigation by the defense"), *cert. denied, Stockton v. Angelone,* — U.S. —, 116 S.Ct. 37, 132 L.Ed.2d 918 (1995); *United States v. White,* 970 F.2d 328, 337 (7th Cir. 1992).

Here it is clear that the defendant had sufficient information to ascertain the supposed Brady material on his own.[12] As Petitioner conceded at oral argument, (Tr. 12/11/96 at 20:17–22; 22:16–19), the information that White was ineligible to assert the Fifth Amendment, and White's juvenile file, were available to defense counsel. Moreover, White's juvenile file was under the control of the Los Angeles Superior Court. (Tr. 12/11/96 at 20:17–22; 22:16–19.) This is dispositive of the issue as "[t]he prosecution is under no obligation to turn over materials not under its control." *Aichele,* 941 F.2d at 764 (finding no *Brady* violation where the state provided rap sheet for government witness, but did not turn over impeachment evidence contained in the witness's prison file) (citing *United States v. Gatto,* 763 F.2d 1040,1049 (9th Cir.1985)).

Moreover, the prosecution did not "*intentionally* distort[ ] the fact-finding process by causing a witness to invoke the fifth amendment privilege." *United States v. Patterson,* 819 F.2d 1495, 1506 (9th Cir.1987) (emphasis in original); *accord United States v. Montoya,* 945 F.2d 1068, 1078 (9th Cir.1991), *cert. denied,* — U.S. —, 116 S.Ct. 82, 133 L.Ed.2d 40 (1995). There is no evidence that the prosecution encouraged White to assert

---

**12.** First, Petitioner and White were tried together for the Green homicide, so Petitioner knew the disposition of the Green case. While it is true that the juvenile adjudication was sealed, the prosecution had previously successfully petitioned to unseal Petitioner's juvenile adjudication, and Petitioner concedes that his attorney could have done the same. (Tr. 12/11/96 at 20:17–22.) Second, Petitioner indicated he was

aware of the potential Fifth Amendment issue, as defense counsel advised the court that White would require independent counsel. Finally, Petitioner cannot complain that defense counsel had *insufficient time* to address this issue, as White's alleged confession occurred over a month before he was called to testify on November 17, 1986.

the protection of the Fifth Amendment, such that "the prosecution created defense witness unavailability or that the fact-finding process was grossly distorted." *Patterson,* 819 F.2d at 1506.

The other necessary element of a *Brady* claim, that the evidence withheld is exculpatory, *Zuno-Arce,* 44 F.3d at 1425, is also lacking here. White's juvenile file shows only that White was found not criminally liable for Green's murder. Such information is not exculpatory material as to the charge that Petitioner killed either Green or Edgardo Kramer. Apparently, Petitioner hoped that White's file would establish that White had no legal basis to refuse to testify, and that if required to testify, he would again confess to killing Green as he did in October 1986. This is highly speculative, however, because earlier that day White denied either shooting or seeing who had shot Green, and had even denied the October 1986 confession. It further piles conjecture upon conjecture to assume that, if White continued to deny shooting Green, he would have been effectively impeached during cross-examination. It is equally arguable that the course White's examination actually took was more exculpatory than any of the supposedly withheld evidence, given that White's assertion of the Fifth Amendment before the jury was immediately followed by Petitioner's denial that he shot Green. (RT at 2942–44.)

The Court therefore finds that Petitioner has not demonstrated a *Brady* violation.

### 3. The Trial Court's Decision to Permit White to Assert the Fifth Amendment Was Harmless Error—Claim 1(2).

■ Petitioner contends that the trial court erred in allowing White to assert the Fifth Amendment privilege. He argues that White's testimony was critical, reliable, and highly probative as to the identity of Green's killer. According to Petitioner, if White had attempted to recant his October 1986 confession, as White had done in the hearing outside the presence of the jury, he would have been effectively impeached. This impeachment, in turn, according to Petitioner, would have exonerated him of Green's killing, and his unjust adjudication in that killing could have been used as a mitigating factor.

The Court finds that although the trial court erred in permitting Petitioner to assert the Fifth Amendment,[13] the error was harmless because Petitioner has not shown that the "error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 1721, 123 L.Ed.2d 353 (1993). At the third trial there was an abundance of conflicting testimony presented as to the identity of Green's killer. *See*

13. White had no basis to invoke the Fifth Amendment. The Double Jeopardy Clause would have prohibited White from being tried a second time for Green's murder. *Breed v. Jones,* 421 U.S. 519, 529, 95 S.Ct. 1779, 1785–86, 44 L.Ed.2d 346 (1975) (jeopardy attaches in juvenile adjudication that determines whether juvenile violated criminal law because determination results in stigma and deprivation of liberty associated with adult criminal conviction). Moreover, California Penal Code section 654, as well as the applicable case law, prohibits successive prosecutions for the same course of conduct. *In the Matter of Johnny V. v. People,* 85 Cal.App.3d 120, 138, 149 Cal.Rptr. 180, 191 (1978); *see also People v. Lohbauer,* 29 Cal.3d 364, 373, 627 P.2d 183, 187, 173 Cal.Rptr. 453, 457 (1981) (failure to unite all offenses arising from the same act or course of conduct, of which the prosecution is or should be aware bars subsequent prosecution of any omitted offense, if the initial proceedings culminate in either acquittal or conviction and sentence).

In addition, the statute of limitations for any charges, other than for capital murder, of which

White had previously been acquitted, had elapsed by the time that White invoked his Fifth Amendment privilege. *See* CAL. PENAL CODE § 800, 801.

California argues that White could have invoked his Fifth Amendment privilege if he feared "his new testimony might suggest that he had perjured himself in testifying on the same subject at [the immediately] prior proceeding [outside the presence of the jurors]." *United States v. Partin,* 552 F.2d 621, 632 (5th Cir.1977), *cert. denied,* 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977). California speculates that White was concerned about perjury as he had admitted before the trial judge that he was involved in an altercation, before he went to the party where Green was killed. (RT at 2906.) Nevertheless, once White was provided with counsel, he asserted his Fifth Amendment privilege when asked if he was involved in an altercation before that same party. (RT at 2917.) Thus White was asserting his Fifth Amendment privilege as to all the events of that evening, not just the statements which could be construed as perjury.

discussion *supra* at II(B)(1)(d). In addition, White's assertion of his Fifth Amendment privilege [14] was indisputably helpful to Petitioner's case, as it added to the convoluted state of the evidence concerning the Green killing. Moreover, at no time during the intervening fourteen year period did White ever come forward to confess, instead, the alleged confession was made in a meeting with the defense investigator, a meeting held for the sole purpose of assisting Petitioner with his third penalty retrial. (RT at 2926–29.) In light of the conflicting testimony and the long period of White's silence, this Court finds White's confession to be of dubious value. Therefore, its exclusion would not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637, 113 S.Ct. at 1721.

Petitioner argues that the inability to present testimony tending to establish another's guilt for the crime cannot be anything but a serious impairment of the basic right to a defense. *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). In *Chambers*, the defendant sought to cross-examine a witness who had confessed to a crime but later repudiated his confession. Due to a state rule preventing a party from impeaching his own witness, the defendant was not allowed to cross-examine the witness. The Supreme Court found that the Mississippi common-law rule "interfered with Chambers' right to defend against the State's charges." *Id.* at 298, 93 S.Ct. at 1047.

*Chambers* is distinguishable.[15] In *Chambers*, the witness had confessed to the very crime for which the defendant was on trial.

Here, the testimony at issue concerned a crime different from that for which the Petitioner was on trial. Therefore White's invocation of the Fifth Amendment in the instant case did not prevent the presentation of testimony that would have tended to establish another's guilt for the crime for which the Petitioner was being sentenced. In addition, "[i]n *Chambers*, the testimony rejected by the trial court bore persuasive assurances of trustworthiness and thus was well within the basic rationale for the exceptions to the hearsay rule." *United States v. Fowlie*, 24 F.3d 1059,1069 (9th Cir.1994) (citing *Chambers*, 410 U.S. at 300–03, 93 S.Ct. at 1048–50), *cert. denied*, 513 U.S. 1086, 115 S.Ct. 742, 130 L.Ed.2d 643 (1995). Here, the circumstances of White's October 1986 confession were inherently suspect. There is also no reasonable basis to infer that his denial of responsibility for the murder would have been effectively impeached, given that he had been adjudicated not liable fourteen years earlier.[16]

The Court therefore finds that the trial court's error in allowing White to assert the Fifth Amendment privilege was harmless.

### 4. The Trial Court Did Not Err in Refusing to Admit the Defense Investigator's Testimony under a Hearsay Exception—Claim 1(3).

■ Finally, Petitioner contends that the defense investigator should have been permitted to testify to White's October 1986 confession under the "statement against penal interest" exception to the hearsay rule. CAL. EVID. CODE § 1230.[17] The trial court

**14.** White's refusal to testify on Fifth Amendment grounds to what can only be characterized as a tangential question regarding whether he was present at the party violated the trial court's explicit order. (RT 2936–37.) Contrary to Petitioner's current position, defense counsel originally argued in favor of allowing White to assert the Fifth Amendment before the jury. (RT at 2915–16; 2918–19.) Ultimately, despite the trial court's order, the jury heard White invoke the Fifth Amendment.

**15.** Moreover, the Supreme Court itself has characterized its decision in *Chambers* as "an exercise in highly case-specific error correction." *Montana v. Egelhoff*, —— U.S. ——, ——, 116 S.Ct. 2013, 2022, 135 L.Ed.2d 361 (1996).

**16.** Petitioner contends if White had been cross-examined, his testimony would have exonerated Petitioner as to Green's murder. However, due to White's invocation of his Fifth Amendment privilege, Petitioner achieved virtually the same result. Instead of having to impeach White to create the inference that it was White—not Petitioner—who killed Green. White's assertion of the Fifth Amendment to a seemingly innocuous question could only have planted the seeds of White's guilt for some events related to the party at which "Green was shot and killed."

**17.** Section 1230 provides: "evidence of a statement made by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavail-

concluded that White had insufficient belief that he could be punished for his role in the Green homicide. (RT at 2933.) The Court finds that the defense investigator's testimony was properly excluded.[18]

■ Even where testimony is properly excluded under a state's standard rules of evidence, however, it may nevertheless violate the Due Process Clause of the Fourteenth Amendment. *Green v. Georgia,* 442 U.S. 95, 97, 99 S.Ct. 2150, 2151, 60 L.Ed.2d 738 (1979) (per curiam). Therefore, the issue before the Court is whether the trial court's ruling rendered "the proceeding so fundamentally unfair as to violate due process." *Bueno v. Hallahan,* 988 F.2d 86, 87 (9th Cir.1993). An evidentiary ruling constitutes a due process violation if "[t]he excluded testimony was highly relevant to a critical issue in the punishment phase of the trial, and *substantial reasons existed to assume its reliability.*" *Green,* 442 U.S. at 97, 99 S.Ct. at 2151 (internal citations omitted) (emphasis added); *accord United States v. Lopez–Alvarez,* 970 F.2d 583, 588 (9th Cir.1992) (exclusion of evidence pursuant to the valid application of the hearsay rules may violate due process if the evidence excluded is "sufficiently reliable and crucial to the defense"), *cert. denied,* 506 U.S. 989, 113 S.Ct. 504, 121 L.Ed.2d 440 (1992).

In *Green,* a third party spontaneously made an incriminating statement to one of his close friends, and there was "ample" evidence corroborating the confession. *Green,*

442 U.S. at 97, 99 S.Ct. at 2151. There were "substantial reasons" to assume the excluded evidence was reliable, and the degree of corroborating evidence was sufficient to impose a guilty verdict, as well as a capital sentence, on the third party. *Id. Green* is inapplicable here, however, where the trial court explicitly found that White's confession was not trustworthy, and on that basis excluded it.[19] (RT at 2932–33.) Green's holding was expressly limited "to the specific facts before it." *Perry v. Rushen,* 713 F.2d 1447, 1450 (9th Cir.1983) (citing *Green,* 442 U.S. at 97, 99 S.Ct. at 2151), *cert. denied,* 469 U.S. 838, 105 S.Ct. 137, 83 L.Ed.2d 77 (1984).

Similarly, In a case involving the exclusion of hearsay testimony against an assertion of the dying declaration exception, the Ninth Circuit has held that "[t]he state court's resolution of this factual question [whether the victim was under an immediate sense of impending death or not] is presumptively correct." *Galindo v. Ylst,* 971 F.2d 1427, 1429 (9th Cir.1992), *cert. denied,* 508 U.S. 914, 113 S.Ct. 2351, 124 L.Ed.2d 260 (1993). The circuit pointed out that the Petitioner had failed to show that the victim's statement "was otherwise reliable." *Id.*

Therefore, because the precise reason the testimony was excluded was due to the state court's finding that the testimony was not trustworthy, a finding that is supported by the state court record, and presumed to be

---

able as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true." CAL. EVID. CODE § 1230.

18. The Court nevertheless notes that this ruling was inconsistent with the trial court's earlier ruling allowing White to assert the Fifth Amendment privilege. That is the very ruling that made him unavailable as a witness. At oral argument Petitioner conceded that if all of the facts had been before the trial court, the trial court's ruling on the hearsay exception would have been correct, and permitting White to assert the Fifth

Amendment privilege would have been in error, (Tr. 12111196 at 31:10–17.)

19. The trial court's finding that the testimony in question was unreliable also distinguishes the instant case from *Washington v. State of Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). In *Washington,* the Supreme Court struck down a state statute which prohibited "persons charged as principals, accomplices, or accessories" in the same crime, from testifying on behalf of the defense in each other's case. *Id.* at 16 n. 4, 87 S.Ct. at 1922 n. 4. Specifically, the Court disapproved of the arbitrary and mechanical manner in which the rule had been applied to bar the testimony of the accomplice. *Id.* at 22–23, 87 S.Ct. at 1925. Here the trial court made a specific finding that the testimony at issue was untrustworthy, a finding clearly supported by the trial record. RT at 2933.

correct, the Court finds there was no due process violation.[20]

## III. CONCLUSION

For the reasons set forth above, Petitioner's Motion for Summary Judgment on claims C(2), H(2), 1(2) and 1(3) is **DENIED**, and Respondent's Cross–Motion for Summary Judgment on these claims is **GRANTED**.

IT IS SO ORDERED.

**20.** Petitioner also argues that White's confession should have been admitted as a declaration against interest, arguing that admitting to killing a human being would create such a risk of making White an object of hatred, ridicule, or social disgrace in the community that a reasonable person in his position would not have made this statement unless it were true. *See* CAL EVID CODE § 1230. However, defense counsel did not raise this exception to the hearsay rule, instead limiting his argument to the declaration against penal interest exception. (RT at 2931–34.) Therefore, this argument was waived by noncompliance with the contemporaneous objection rule. *Engle v. Isaac*, 456 U.S. 107, 109, 102 S.Ct. 1558, 1562, 71 L.Ed.2d 783 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 2506–07, 53 L.Ed.2d 594 (1977); *People v. Benson*, 52 Cal.3d 754, 786 fn. 7, 802 P.2d 330, 276 Cal.Rptr. 827 (1990), *cert. denied*, 502 U.S. 924, 112 S.Ct. 336, 116 L.Ed.2d 277 (1991); *People v. Green*, 27 Cal.3d 1, 22, 609 P.2d 468, 164 Cal.Rptr. 1 (1980), *overruled on other grounds*, 41 Cal.3d 826, 718 P.2d 99, 226 Cal.Rptr. 112 (1986).